## THE STATE OF KANSAS v. ENOCH B. KEARLEY.

1. HOMICIDE; *Conditional Intent to Kill.* While a premeditated, deliberate intent to take life is essential to the crime of murder in the first degree, yet if a party goes to have an interview with another, having armed himself with a deadly weapon, with the intent to compel such other to do any certain thing, or upon his refusal, to kill him, such conditional intent to take life is sufficient to make the homicide, if committed, murder in the first degree.

2. CHARGE TO JURY, *When Sufficient.* It is ordinarily sufficient if the court in its charge to the jury state once, fully and clearly, the general propositions of law applicable to the case, such as those concerning reasonable doubt and the presumption of innocence, and it is seldom error if it fails to restate those propositions in connection with any separate and special phase of the case.

3. REASONABLE DOUBT, *Defined.* The court, in attempting to define reasonable doubt, said: "That to exclude such doubt, the evidence must be such as to produce in the minds of prudent men such certainty that they would act on the conviction without hesitation, in their own most important affairs." *Held,* That such definition and explanation did not narrow the import of the phrase "reasonable doubt" to the prejudice of the substantial rights of the defendant.

4. INSTRUCTION, *Properly Refused.* Where parties meet, and in an affray one is killed, *held,* that an instruction was properly refused which seemed to limit the consideration of the jury to the mere circumstances of the interview, and excluded any consideration of the evident angry feelings under which the parties met.

5. ———— *Newly-Discovered Testimony.* Where newly-discovered testimony runs simply to the matter of threats, and only tends to make more emphatic and clear what is already plain by the testimony, that the parties at the time of meeting were enraged against each other, *held,* that the court did not err in refusing a new trial on this ground.

6. NEW TRIAL, *Properly Refused.* Where a party in apparent good health is assailed, his body pierced with three bullet wounds, and he thereupon falls to the grounds and dies within thirty minutes, *held,* that a new trial was properly refused when sought on the ground that certain competent physicians had been found who would testify that none of the wounds described was necessarily fatal.

*Appeal from Johnson District Court.*

AT the March Term, 1881, of the district court, *Enoch B. Kearley* was convicted of murder in the first degree. The

homicide charged in the information filed against him was that of John W. Wyatt, on November 1, 1880. From such conviction the defendant has appealed. The opinion states the facts.

*A. Smith Devenney*, for appellant, presented a critical and elaborate analysis of the evidence, and contended that if there was any legitimate presumption that the accused fired the first shot, he rebutted such presumption by irrefragable evidence, unless the jury is empowered to arbitrarily ignore such evidence; that a jury should not be allowed to arbitrarily reject the testimony of unimpeached, or even uncontradicted, witnesses, which does not lack probability; and a verdict, even in a civil case, in conflict with their uncontradicted testimony, cannot be sustained. (30 Iowa, 251; 39 id. 435; 2 Bond, 147.)

From the testimony of Hunter and that of the defendant, and the admission that the balls taken from the body of Wyatt and produced and admitted in evidence were not, nor was either of them, fired from the defendant's pistol offered in evidence, independently of the question of "reasonable doubt," the jury could not have found, from the evidence, defendant guilty of the alleged murder—no matter whether that fatal wound, upon the left side, was given while the body of Wyatt was flat upon the ground or erect, because the bullet producing death was not fired from a pistol in the hand of Enoch B. Kearley. (38 Ill. 527.)

Counsel claimed that the prosecution had suppressed important testimony, (that of Fox and Green;) that this should neither be tolerated nor encouraged by the courts, and is a ground for reversal. (10 Mich. 225; Roscoe's Cr. Ev. 164; 1 Starkie's Ev. 437; 45 Cal. 289.)

The verdict is not sustained by the evidence. No matter how positive and direct the testimony for the state may be, it is still but a *prima facie* case, and although the accused is thereby put upon his defense, it does not thence follow that he is *presumptively guilty*, or that he must establish the facts upon

which he relies by a preponderance of evidence. (18 Wall. 517; 66 Mo. 191.)

A very brief examination of the American authorities makes it evident that the ancient doctrine as to the duty of the person assailed to retreat as far as he can before he may repel force by force, has been greatly modified in this country, and has with us a much narrower application than formerly. Indeed, the tendency of the American mind seems to be very strongly against the enforcement of any rule which requires a person to flee when assailed, to avoid chastisement or even save human life. (Comp. Laws of Kas. 1879, ch. 31, §§ 9, 10; 2 Wharton's Cr. Law, § 1019; 1 Bishop's Cr. Law, 5th ed., § 865; Horrigan & Thompson on Self-Defense, 1–3, 228–231, and cases cited; 2 Brews. 401; 24 Ind. 151; 15 Ga. 117.)

The inference cannot in justice be fairly drawn beyond a reasonable doubt, from the testimony, that there was on the part of the defendant the requisite *deliberation*. (25 Mich. 412–416; 5 Strobh. 91.)

The verdict is too severe — is contrary to the law and the evidence; and therefore the defendant should be granted a new trial. (65 Mo. 149; 31 Tex. 416; 2 Whar. Cr. Law, § 970.)

The court attempts to define "malice," as including anger, hatred, revenge, and every unlawful and unjustifiable motive. In this the court erred, since the offense charged is murder in the first degree. Such a definition would almost, if not wholly, remove manslaughter from the catalogue of homicides. If such definition be correct, then the trial court need only say to the jury, as its opinion seems to insinuate, that the case is one of murder in the first or second degree and nothing less, and the verdict is assured for murder. Manslaughter may, sometimes, be *intentional.* It is not justifiable to take life under all cases of provocation, and yet a provocation may be serious enough to deprive intentional killing of its *malicious* character, so that it is neither murder on the one hand, nor justifiable or excusable on the other. Provocation usually repels the presumption of malice. (17 Iowa, 138; 35 Mich. 16; 31 Ind. 511; 43 Ala. 21; 5 Tex. App.

397; 5 Ga. 48; 5 Cush. 295; 13 Smed. & M. 263. See also 33 Ga. 4; Horrigan & Th. on Self-Defense, 230, 231; 18 Mo. 419; 6 Blackf. 299.)

The court should have instructed the jury upon the point of time elapsing after the firing of the first shot by Wyatt and the time defendant started in pursuit; that they should allow time for the passion, engendered by the shot, to subside and the blood to cool. Sufficient time—two seconds—had not elapsed in the interval for the blood to cool to justify a verdict of murder in the first degree. It would be manslaughter only. (69 N. C. 267; 25 Mich. 405; 3 Selden, 396; 30 Ind. 197; 2 Bishop on Cr. Law, 3d ed., § 734; 2 Whar. Cr. Law, §§ 932, 984, 990; 7 Jones, 206; Whar. on Homicide, 179–181. See also 1 Tex. App. 417; 49 Ind. 33.)

The origin of the difficulty is unnoticed by the court in its general charge to the jury. The facts developed imposed the duty upon the court to give all such matters especial notice and attention by full, or at least some explicit instruction pertaining thereto; and as *all* the testimony is before the reviewing court, the necessity is apparent for elaboration by the *nisi prius* court. The statute requires that the court shall state to the jury all matters of law which are necessary for their information in giving their verdict, whether asked for or not. (Cr. Code of Kas., § 236; 62 Mo. 596; 65 id. 149; 4 Ired. 409, [diss. op.]; 41 Tex. 306; 61 Mo. 232.)

The court, in defining or attempting to define the phrase " a reasonable doubt," said: " The law presumes the defendant innocent until his guilt is established beyond a reasonable doubt. To exclude such doubt, the evidence must be such as to produce in the minds of prudent men *such* certainty that they would act on the conviction without hesitation in their own most important affairs." This definition is too narrow and limited; also, the law requires that there must be in the juror's mind an abiding conviction to a moral certainty of the truth of the charge against the accused. This is not required of the jury, according to the charge of the court as given. Besides, it excludes all reasonable doubts that may arise from

the lack or want of evidence. (67 Ind. 306; 1 Dakota Ter. 451; 47 Cal. 96; 51 id. 372.)

The court should have sustained the motion for a new trial upon each and every ground assigned. While it may be conceded that a new trial will not be granted on the ground of "newly-discovered evidence," where such evidence is merely cumulative, yet if the evidence in any degree has an independent and distinct bearing upon the issues (as the affidavits disclose in this case), a new trial ought to be granted—more particularly in a case of this magnitude and importance. The law does not require the highest degree of diligence—only reasonable diligence—and this was exercised on behalf of defendant. (16 Iowa, 121–127; 38 id. 368.)

If newly-discovered evidence is material, and it is shown that the applicant did not know of the evidence before trial, and could not by the use of reasonable diligence have sooner discovered it, (as the affidavits in this case clearly make manifest,) a new trial should be granted, though the evidence is in some degree cumulative. (37 Iowa, 224; 42 id. 411. See also 50 Tex. 371, and cases cited.)

*John A. Rankin*, and *Burris & Little*, for The State:

The evidence is just as clear that the defendant fired the fatal shot as it is that Wyatt is dead, and of this there is no question; but the defendant put this proposition at rest by his special instruction, under which the jury found him guilty. The state admitted that the balls offered in evidence were not shot out of the pistol offered in evidence by the defendant, because that pistol was not in our judgment the one with which Kearley killed and murdered Wyatt.

Defendant stated to Paisely after he had killed Wyatt, that he would have fired sooner if he could only have got his pistol to revolve. If his pistol had only revolved when he drew it up—just then Wyatt fired and attempted to run—Wyatt would have been killed by Kearley in the mouth of the lane. Defendant said, "You are a damned liar," and raised his revolver, and then Wyatt fired and ran. It is evident that the

Kearleys intended before they left home, to kill Wyatt. Each had a revolver, and when they arrived at the mouth of the little lane that leads to Wyatt's house, they concealed themselves in the brush, and sent for Wyatt. When defendant called Wyatt "a damned liar," why did he go to his horse and get his revolver from his overcoat pocket and put it in his breast, or under his arm? Had Wyatt attempted to harm him? No, he had not uttered a single insulting word to Kearley or either of them, and was under promise that he should not be hurt nor harmed; but defendant got his pistol for use, and he did use it, and did intend to kill, and did in cold blood, kill Wyatt.

We have examined some of the authorities cited by counsel for appellant, and think they have no application to this case. The instructions given by the judge upon his own motion, cover all the law on the subject. We see no errors in any of them. We thought the court should not have given the sixth special instruction asked for by the defendant, because the evidence shows that both the Kearleys fired shots into the body of Wyatt, any one of which might have produced death; but as the court gave the instruction at the instance of the defendant, and the jury found him guilty of murder in the first degree, this leaves no question as to which of the Kearleys fired the fatal shot.

The opinion of the court was delivered by

BREWER, J.: On the 29th day of March, 1881, the defendant was convicted of murder in the first degree, in the district court of Johnson county, and from that conviction has brought this appeal to this court. The homicide charged in the information was that of John William Wyatt, on the 1st day of November, 1880.

The first and principal question made by the learned counsel for appellant is, that the testimony does not warrant a conviction for any crime, much less that of murder in the first degree.

The testimony is all before us, and in support of his claim

counsel has presented a critical and elaborate analysis of the evidence. His argument is one which if addressed to us as jurors trying the facts, would compel the most careful deliberation, and unless the manner of the witnesses upon the stand had thrown discredit upon some of them, would, we think, have led us to the conviction that defendant was guilty of no higher crime than murder in the second degree. Yet we are constrained to say that there was testimony indicating forethought and preparation, from which a jury was warranted in finding the defendant guilty, as it did, of murder in the first degree.

It would be a useless labor to recapitulate all the matters of testimony. These things, however, are clear: the defendant's daughter had been married to one Samuel Green; they had separated, and the deceased was, as it was believed, the cause of their separation. At the instance of this daughter, an interview between the deceased and the defendant was sought, on the Saturday preceding the homicide; but it failed, owing to the fact that the deceased went to Kansas City upon that day. That failing, an interview was sought and accomplished on the day of the homicide. It does not appear that either defendant or the deceased was instrumental in bringing about this interview; though the defendant was more anxious for it and the one obviously seeking to accomplish something by it. The house of deceased was situated a little off from the public road, and a private lane or passage-way, of about 200 yards in length, led from his house to the public road. On the morning of the fatal affray, the defendant, his son and daughter, rode on horseback to the mouth of this lane, and sent word to deceased that they would like to see him. On receiving the invitation, he left his house, went through the lane with two or three friends, and near the mouth met the defendant, his son, and daughter. On both sides the parties had pistols. The defendant demanded that deceased should retract what he had said; high words followed, shots were fired, and deceased turned and fled toward his house. The defendant and his son pursued,

and in the pursuit deceased was shot and killed, receiving three or more wounds. There was testimony, contradicted it is true, but testimony that after the deceased fell, the defendant and his son stood over and fired each one shot into his prostrate body. Beyond peradventure the deceased was killed by some of the shots fired in that affray. Immediately after the affray, the defendant's son and son-in-law fled the country, and have not since been heard from. The contention of defendant's counsel is, that the fatal bullets were not fired by defendant, but by either his son or son-in-law; or, secondly, that if fired by defendant, they were so fired in the heat of an affray with the purpose of self-defense, or at least without previous deliberation and thought. The testimony as it stands in the record is doubtless such as to cast a doubt on both of these questions, but there was positive testimony amply sufficient to justify a jury in finding that one of the fatal shots, at least, was fired by the defendant. It is also clear that the defendant armed himself, with the determination of compelling a retraction at the point of a pistol, with all the consequences before him that might follow from a possible refusal. And the question was fairly presented to the jury, whether under such circumstances a fatal result should be classed as murder in the first or second degree. Unquestionably the deceased was armed, expecting an affray, and in it he fired the first shot; but also beyond question, upon the firing of such shot, he turned and fled, was pursued by the defendant and his son, and in the pursuit was killed. There was testimony that, as the defendant and his son pursued the deceased, the former called to his son to "kill him, God damn him, kill him!" and that as they stood over the fallen body both father and son fired into it. While under the circumstances the jury might properly have found that the killing, though intentional, was done only in the heat of the affray, we cannot say that they were not also justified in finding, considering the purpose for which the interview was sought, and the previous preparation in the way of arming, that the defendant went there intending to compel a retrac-

tion, or to kill if the same was refused. This implies, it may be, only a conditional premeditated intent to take life; and yet such an intent is sufficient, if subsequently carried into effect, to make murder in the first degree. We do not understand that, in order to constitute this crime, there must be an absolute, unconditional, premeditated attempt to take life. If one party seeks an interview with another, arming himself for the encounter, intending deliberately that such other shall do some certain thing, or failing to do that, that he will kill him, such conditional intent is sufficient, if carried into effect by the homicide of the latter, to make murder in the first degree.

1. Homicide; conditional intent to kill.

A party may contemplate robbery alone; yet if he has previously determined to kill if necessary in order to accomplish the robbery, such determination is the premeditated intent which constitutes murder in the first degree, and that notwithstanding the party hopes and expects to accomplish the robbery without the killing.

If the deceased had done aught against the laws of the state, the courts were open to punish or restrain; and when the defendant took the law into his own hands, and attempted to accomplish by force the righting of his wrongs, or supposed wrongs, he became himself the aggressor, and must take the consequences of all that comes within the probable scope of his intended action.

This is not like the case of *Craft v. The State*, 3 Kas. 450, in which parties who had been friends met accidentally, and a sudden quarrel arising, one was killed; for here there was difficulty and feeling between the parties — the interview was sought, each party was armed, and the defendant obviously went to the place of meeting with the intention of compelling the deceased to retract, explain, or apologize. The first words used indicated the intense feeling, and throw great light on the motives with which the interview was sought. Angry feelings did not arise after they met, or grow out of the matter of the interview; and under those circumstances the jury was justified in finding that the defendant came there with the in-

tent to kill, unless a satisfactory retraction, explanation or apology was given. Such an intent, as we have already said, lifts the crime from the lower to the higher degree. Doubtless the testimony offered by the defendant presents the transaction in a different light; but so far as the testimony of the witnesses conflicted, the decision of the jury is final. Upon the undisputed facts, and the testimony offered by the state, it must be adjudged that the verdict of the jury was correct.

No objection was made to any of the testimony offered by either side, and therefore no question concerning it is properly before us; nor if it were, do we see any serious objection to any of it. Apparently it was all proper, and properly admitted.

Defendant complains also of the instructions, pointing out from fifteen to twenty matters in which he insists the court erred. We have examined each one, but fail to perceive any material error. Taken as a whole, the instructions presented the law fully, fairly, and correctly. Indeed, the law applicable to a case of this kind is limited in extent, for the questions are rather those of fact than of law. Among the various matters questioned by counsel are the following: In one portion of the charge the court said, "Manslaughter in the first degree, so far as it may have any bearing in this case," etc. From this language counsel contends that the jury would infer that the opinion of the court was, that the crime was of a higher degree than manslaughter. We fail to see any possibility of such an inference. The language of the court was obviously used in view of the fact that manslaughter in the first degree, as defined in the statutes, embraces many things which could not possibly come within the purview of this charge.

Again, the defendant asked a special instruction that the jury should give the defendant the benefit of a reasonable doubt as to whether he had acted in self-defense. This was refused, and the refusal is complained of. In its general charge the court had defined "reasonable doubt;" had instructed the jury generally that the defendant was presumed

innocent until his guilt was established by the evidence be-
yond a reasonable doubt; and also further, if they found him
guilty, but had doubt as to the degree of offense, that they
should give him the benefit of that doubt, and find the de-
fendent guilty of only the lower degree.    It also instructed
specifically and fully upon the law of self-defense and the
circumstances under which defendant was justified in taking
the life of deceased.    Putting the whole charge together, it
does not seem that the jury could have been misled as to the
duty of giving the defendant the benefit of a reasonable doubt
in respect to every essential element in the case.    It is seldom
the duty of the court to repeat any general prop-

2. Charge to the jury, when sufficient.

osition of law in connection with every special
phase of the case : it is enough if it is once clearly
and fully stated.    Again, counsel criticises the definition
given by the court of "reasonable doubt."  Its language was
this :  " To exclude such doubt, the evidence must be such
as to produce in the minds of prudent men such certainty
that they would act on the conviction without hesitation in
their own most important affairs."    It has been often said
by courts of the highest standing that perhaps no defi-
nition or explanation can make any clearer what is meant

3. Reasonable doubt.

by the phrase "reasonable doubt," than that which
is imparted by the words themselves.    Be that
as it may, we think the definition given by the court did not
prejudice the defendant by narrowing the scope and import
of that familiar phrase.

Further, it is insisted that between the time of the first
shot, that fired by Wyatt, and the fatal shot, there was not
snfficient time for premeditation, and that the court failed to
call special attention to this fact.    It is earnestly insisted that
the law allows "cooling" time, and that because of the want
of this, the offense could not be above murder in the second
degree.    Doubtless this view of counsel would be correct if
the parties had met accidentally, without feeling, without
preparation for, or expectation of an affray, but such was not
this case.    This conviction can be supported only upon the

theory that the defendant went to the place of homicide with
the thought present in his mind, of taking life. There was
testimony from which the jury could properly find that such
was the fact. To limit their consideration to the mere cir-
cumstances of the interview, and to compel them to ignore all
that indicated antecedent feeling, would fail to
present the case as it truly stood; and to empha-
size any particular transaction at the time of the
interview, ignoring the circumstances which preceded it,
would equally present the case in a false light. We cannot
think that the court erred in its rulings in this respect. We
deem it unnecessary to notice any of the other instructions;
we see nothing in those given or refused in which any ma-
terial wrong could have been done to the substantial rights of
the defendant.

4. Instruction, properly re-fused.

Finally, the only further question we deem it necessary to
notice is that raised by the counsel for appellant on the motion
for a new trial. Defendant insists that the newly-discovered
evidence was such as to entitle him to a new
trial. This evidence as disclosed by the affi-
davits was simply of threats made by the deceased against
the defendant, and also an intimation that in the opinion of
several very respectable physicians and surgeons, the wounds
described in the body of deceased were not necessarily fatal.
We dismiss the latter thought with the remark that where a
man in apparent good health is pierced with several bullets
and immediately thereafter dies, a verdict of the jury that the
deceased came to his death by those bullets will not be dis-
turbed unless it is very clear that such wounds could not have
caused the death. A mere expression on the part of the phy-
sicians that this wound or that was not necessarily
fatal, amounts to little. The fact is, the man was
alive, was shot, and immediately died; and no
mere theories as to the effect of the separate wounds avail
against these facts. Common sense refers the death to the
shot, and no jury will ever hesitate as to the relation of cause
and effect.

5. Newly-discov-ered testimony.

6. New trial, properly re-fused.

So far as the other matter disclosed by the affidavit is concerned, that of threats or ill-feeling of deceased toward defendant, it is not sufficient to justify a setting aside of the verdict. The fact of a preëxistent ill-feeling was obvious on the trial; neither party was free from this ill-feeling. The new testimony would only make clearer that which was sufficiently disclosed upon the trial. Strictly, it was only cumulative, and cumulative testimony seldom if ever justifies any interference with a verdict. We cannot think that with this testimony the verdict would have been other than it was, and hence the verdict as returned ought not to be disturbed.

Taking the case as a whole, and in conclusion it must be said, that the proceedings seem to have been regular and the verdict fully sustained by the evidence. The conviction must therefore be affirmed, and it is so ordered.

All the Justices concurring.