D. B. HERNDON, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed February 24, 1917.

1. In passing upon an assignment questioning the correctness of the ruling of the trial court in denying a motion for new trial which is based upon the sufficiency of the evidence to sustain the verdict, the guiding principle for an appellate court is not what it may think the jury *ought* to have done or what such court may think it would have done had it been sitting as a jury in the case, but whether as reasonable men the jury could have found such verdict. If this question can be answered in the affirmative, the action of the trial court upon such motion should not be disturbed.

2. While the legal effect of evidence is a question of law to be passed upon by the court when properly presented, the credibility and probative force of conflicting testimony are for the determination of the jury.

3. The answer of a witness on cross-examination respecting any fact irrelevant to the issue will be conclusive, and no questions relating to facts irrelevant to the issue can be put on cross-examination merely for the purpose of impeaching the credit of the witness by contradicting him.

4. In a prosecution for murder, objections interposed to questions propounded on the direct examination of a witness are properly sustained, when such questions seek to elicit information from the witness as to the distance between the defendant and the deceased when the fatal encounter took place and as to how far from the deceased a certain designated track was, and it has been made to appear from the examination of such witness that he was not present at the tragedy, but had

visited the place thereof after it had occurred and saw tracks there, and that all the information which the witness possessed as-to the distance between the defendant and the deceased at the time of the shooting and as to the identity of the tracks which the witness saw was derived from statements made to the witness by the defendant and others. BROWNE, C. J. and TAYLOR, J., dissent.

5.  Applications for new trial upon the ground of newly discovered evidence are looked upon by the courts with distrust and disfavor, and are granted only under the following restrictions: (1) The evidence must have been discovered since the former trial; (2) the party must have used due diligence to procure it on the former trial; (3) it must be material to the issue; (4) it must go to the merits of the cause, and not merely to impeach the character of a witness; (5) it must not be merely cumulative; (6) it must be such as ought to produce on another trial an opposite result on the merits. The party applying must make his vigilance apparent, for if it is left even doubtful that he knew of the evidence, or that he might, but for the negligence, have known of and produced it, he will not succeed in his application.

6.  In passing upon a motion for a new trial upon the ground of newly discovered evidence, even if it can be properly assumed that the affidavits of the defendant and his attorneys show that they had used due diligence to procure the newly discovered evidence on the former trial, that it is material to the issue and that it can be said to go to the merits of the cause, if it is not of such a nature that it ought to produce on another trial an opposite result on the.merits, and if it is merely cumulative, such motion is properly denied.

7.  Where newly discovered testimony runs simply to the matter of threats, and only tends to make more emphatic and clear what is already plain by the testimony, that the parties at the time of meeting were enraged against each other, *held,* that the court did not err in refusing a new trial on this ground.

8.  Error cannot be assigned of the judge's failure to charge upon any question of law unless the party desiring it shall have requested charges thereon.

9.  Evidence examined and found sufficient to support the verdict.

Writ of Error to Circuit Court for Madison County; D. J. Jones, Judge.

Judgment affirmed.

*Chas. E. Davis,* for Plaintiff in Error;

*T. F. West,* Attorney General, and *C. O. Andrews,* Assistant, for the State.

SHACKLEFORD, J.—D. B. Herndon was indicted for the crime of murder in the first degree, tried before a jury, convicted of the crime of manslaughter, and sentenced to confinement at hard labor in the State prison for the period of seven years, from which judgment and sentence he seeks relief here by writ of error.

Seven errors are assigned, of which the first, third and sixth are expressly abandoned. The first assignment argued is the seventh, which is based upon the overruling of the motion for a new trial, the grounds of which motion are as follows:

"1. The verdict is contrary to the evidence.

"2. The verdict is contrary to the law and the evidence.

"3. The court erred in refusing to permit A. D. Stanton to testify as to the whole conversation had between him and A. H. Touchstone.

"4. The Court erred in refusing to permit A. D. Stanton to testify as to the distance, as pointed out by D. B. Herndon, between said Herndon and Henry Griffin at the time of the shooting of said Griffin.

"5. The court erred in refusing to permit A. D. Stanton to answer the following question: 'How far from that place (the track indicating that a person had turned)

was the last track toward Pinetta that seemed to be turned North?'

"6. The court erred in refusing to permit A. D. Stanton to answer the following question: 'How far from the dead man was the last track toward Pinetta that seemed to be coming backward?'.

"7. The court erred in failing to instruct the jury as to what was justifiable homicide.

"8. The court erred in giving the following instruction to the jury: 'If the evidence in this case should convince the jury beyond a reasonable doubt as to a moral certainty that the defendant, in Madison County, Florida, at any time within the two years immediately preceding the finding of this indictment, unlawfully killed Henry Griffin in the manner and by the means charged in this indictment, and the jury should not find from the evidence beyond a reasonable doubt that such killing was perpetrated from and with a premeditated design on the defendant's part to effect the death of the said Henry Griffin, and the jury should not find from the evidence beyond a reasonable doubt that such killing was perpetrated by an act imminently dangerous to another and evincing a depraved mind regardless of human life, then you should find the defendant guilty of manslaughter.'

"9. Because of newly discovered evidence as set forth in the affidavit of Emery Welch hereto attached."

The affidavit of Emery Welch, attached thereto, is as follows:

"Before me personally appeared Emery Welch, who being by me first duly sworn, deposes and says: That about a mile and a half from the town of Pinetta, Florida, near Taylor & Brady's mill, about a week before Henry Griffin was killed, he had a conversttion with said Henry Griffin; that in said conversation affiant said that

they are having some trouble around Pinetta over the blind tigers, and Henry Griffin replied that there was only one man giving them any trouble, and that was that low down Burt Herndon; that he was going to put a stop to it; that if he ever caught Burt Herndon in the right place he was going to kill him, and that would put a stop to it all; and affiant said that if he were Griffin he would not have any trouble about it, and Henry Griffin replied that he did not care anything for the trouble, and that he was going to get rid of Burt Herndon; that Griffin repeated this threat several times in different words."

Then follows this affidavit of the defendant, D. B. Herndon:

"Before me personally appeared D. B. Herndon, who being by me first duly sworn, deposes and says: That he has read the affidavit of Emery Welch this day made, regarding a threat made about a week before Henry Griffin was killed, by said Henry Griffin to kill affiant; that affiant did not know of the facts set forth in said affidavit or any portion thereof or have any intimation thereof or have reason to believe that such facts existed, until since the trial and conviction of affiant for the killing of said Henry Griffin; that since said homicide, affiant has used due diligence to procure said testimony for the trial of said cause, and has inquired of, and has endeavored to procure from every person who he had reason to believe knew of any fact material to the case, and has also had other persons to endeavor to secure all testimony material to the case; that he did not suppose or have reason to believe that said Emery Welch knew the facts set forth in his affidavit or any fact material to defendant's case, and that only since said trial and conviction said Emery Welch voluntarily came to said affiant and told him of the contents of said affidavit, and that im-

mediately thereafter affiant informed his attorneys of said facts."

Then follows this affidavit of Chas. E. Davis and R. H. Rowe, the attorneys for the defendant:

"Before me personally appeared C. E. Davis and R. H. Rowe, each of whom being duly sworn, deposes and says each for himself that he did not know, or have reason to know, anything whatever of the existence of the facts set forth in the affidavit of Emery Welch hereto attached, prior to the trial of D. B. Herndon for the killing of Henry Griffin, and only knew of said fact since said trial when told of same by D. B. Herndon."

We shall follow our established practice and consider only such grounds of this motion as are argued before us. Smith v. State, 65 Fla. 56, 61 South Rep. 120, and Thomas v. State, decided here at the present term. It is strenuously contended that the evidence adduced is not sufficient to support the verdict. As we have repeatedly held:

"An appellate court should not grant a new trial upon the ground of the insufficiency of the evidence to sustain a verdict of guilty affirmed by the trial court if there is some substantial evidence of all the facts legally essential to support the verdict, and the whole evidence is such that the verdict may fairly have been found on it.

"Where there is evidence from which all the elements of the crime may legally have been found or inferred, and it does not appear that the jury were not governed by the evidence, the verdict will not be disturbed by the appellate court on the ground of the insufficiency of the evidence.

"A verdict will not be set aside by an appellate court where the propriety of the verdict depends not upon the lack of evidence, but upon the credibility or weight of

conflicting competent testimony." Smith v. State, 66 Fla. 135, 63 South. Rep. 138, and Thomas v. State, supra. In Barrentine v. State, 72 Fla., 1, 72 South. Rep. 380, we held that "The refusal of the trial court to grant a new trial for insufficiency of the evidence to sustain the verdict, or because the verdict is contrary to the evidence, will not be reversed; unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the appellate court that it is wrong and unjust." In Young v. State, 70 Fla. 211, 70 South. Rep. 19, following prior decisions of this court, we held that "When the trial court concurs in the verdict rendered by a jury by denying the motion for a new trial, and there is evidence to support it, an appellate court should refuse to disturb it, in the absence of any showing that the jurors must have been improperly influenced by considerations outside the evidence." We have likewise held several times: "In passing upon an assignment questioning the correctness of the ruling of the trial court in denying a motion for new trial which is based upon the sufficiency of the evidence to sustain the verdict, the guiding principle for an appellate court is not what it may think the jury *ought* to have done or what such court may think it would have done had it been sitting as a jury in the case, but whether as reasonable men the jury could have found such verdict. If this question can be answered in the affirmative, the action of the trial court upon such motion should not be disturbed." Tully v. State, 69 Fla. 662, 68 South. Rep. 934. As we have also held: "While the legal effect of evidence is a question of law to be passed upon by the court when properly presented, the credibility and probative force of conflicting testimony are for the determination of the jury." Tampa & Jackson-

ville Ry. Co. v. Crawford, 67 Fla. 77, 64 South. Rep. 437.

These well established principles of law must guide us in determining whether the evidence in the instant case is sufficient to support the verdict rendered. It is also incumbent upon us to consider and pass upon the contention of the defendant that certain errors of law and procedure were committed during the trial which were so material and harmful to him as to compel a reversal of the judgment. We think that it is advisable to consider these alleged errors before we express an opinion as to the sufficiency of the evidence, even though such grounds of the motion for a new trial are argued first before us.

It is urged that the court erred in sustaining the objection interposed by the State to the following question propounded by the defendant to Tom Corbett, a witness introduced by the defendant in his behalf: "Did Mr. W. T. Mann while riding with you and your brother on that occasion, tell you, in your brother's presence, that on Thursday before the killing, he had a conversation with the defendant near the back end of Pinetta Supply Company's store, in which conversation he, Mann, stated that Mr. Griffin would kill Herndon the first time he crossed his path, and also said 'Whatever you do, Bert, you keep your eye on Mr. Griffin; you are going to have trouble with that man.'" This forms the basis for the second assignment.

The bill of exceptions discloses that Tom Corbett was the first witness introduced by the defendant in his behalf, after the State had rested, and had testified as follows: "I have been sworn. I know W. T. Mann, a witness in this case. I remember the occasion when Mr. Griffin was killed. On Thursday before the killing, I rode with Mr. Mann and my brother all of the way to my father's house. I cannot state that on that trip he detailed

to me and my brother any conversation that he had had with Bert Herndon. I recall what was said. The question of Mr. Herndon and Mr. Griffin was brought up." Then the question was propounded to him which we have just copied above and to which the objection was sustained. The only possible basis for this question was that W. T. Mann had been introduced as a witness on behalf of the State and on his direct examination testified as follows: "My name is W. T. Mann. I live about five miles East of Pinetta. I lived there on July 5, 1915. I know. D. B. Herndon, and knew Henry Griffin in his life time. I remember the occasion of the death of Mr. Griffin. I had a conversation with Mr. Herndon on Thursday before the killing. In that conversation he spoke of Mr. Griffin. He called me out of the North-West door of the Pinetta Supply Company. He stated that he had heard it rumored around in my settlement that he had been selling liquor. I told him that there were such rumors. Then he told me to tell anybody down there that said he had been selling liquor that they were G_____ D_____ L_____ sons of bitches. I asked him if he thought they would turn him up. He said 'No, damn them, they won't.' He said that there were no people down there against him but Henry Griffin and old Rabb."

On cross-examination, the witness gave the following testimony: "I have had a difference with Mr. Herndon but this was years ago. I have also had difference with Henry Griffin. Q. Did you not on Thursday before the killing while riding with Tom Corbett and his brother out toward your home state in their presence that you had a conversation with the defendant that day near the back end of Pinetta Supply Company's store and in that conversation you said that Mr. Griffin would kill

Herndon the first time he crossed his path, and also said 'Whatever you do, Bert, you keep your eye on Mr. Griffin; you are going to have trouble with that man,' or words to that effect?"

The question propounded to W. T. Mann on his cross-examination and which he was permitted to answer without any objection being interposed thereto not only was not in cross of anything to which he had testified on his direct examination, but also called for matter irrelevant to the issue, therefore the negative answer given by the witness was conclusive.   See Stewart v. State, 42 Fla. 591, 28 South. Rep. 815, wherein we held: "The answer of a witness on cross-examination respecting any fact irrelevant to the issue will be conclusive, and no question relating to facts irrelevant to the issue can be put on cross examination merely for the purpose of impeaching the credit of the witness by contradicting him."   Also see Livingston v. Roberts, 18 Fla. 70, text 76; Eldridge v. State, 27 Fla. 162, 9 South. Rep 448; Myers v. State, 43 Fla. 500, 31 South. Rep. 275; Fields v. State, 46 Fla. 84, 35 South. Rep. 185; Starke v. State, 49 Fla. 41, 37 South. Rep. 850; Johnson v. State, 58 Fla. 528, 67 South. Rep. 100.   The witness, Mann, had testified to a conversation which had taken place between him and the defendant. It was not sought either on the cross-examination of Mann or on the direct examination of Tom Corbett to elicit other portions of that conversation, but a statement made by Mann to another person when the defendant was not present, consequently the authorities cited by the defendant, Thalheim v. State, 38 Fla. 169, 20 South. Rep. 938; Fields v. State, *supra;* Pressly v. State, 61 Fla. 46, 54 South. Rep. 367, are not in point and do not support him in this contention.   We must hold that the second assignment has not been sustained.

We now reach the fourth and fifth assignments, which are as follows:

"4.. The Court erred in sustaining the State's objection to the following question propounded to A. D. Stanton: How far apart were they?

"5. The Court erred in sustaining the State's objection to the following question propounded to A. D. Stanton: How far from the dead man was that last track towards Pinetta that seemed to be coming backward?"

These assignments are not separately argued, it being stated in the brief that they are discussed under the 7th assignment, which is based upon the overruling of the motion for a new trial and which we have partially treated above. A. D. Stanton was introduced as a witness in behalf of the defendant and the following proceedings took place:

"I am sheriff of Madison County. I know Bert Herndon. I saw him on or about July 5 this year. I remember the occasion of the death of Henry Griffin. I saw the defendant in Pinetta that day. I had an engagement with him in Pinetta on that day. I phoned him to meet me in Pinetta. I went to Pinetta and got there, perhaps a quarter to ten in the morning. I know Mr. Touchstone, and I have seen him a few times. I saw him in Pinetta that morning first with Bert Herndon. When I first saw them they were coming down the Georgia & Florida railroad track just beyond Pinetta within the city limits. I was up at Pinetta, and the car stopped in front of the drug store, and I got to the car just a few minutes before they walked up, and I spoke to them. At that time Mr. Herndon made a statement with reference to the killing of Mr. Touchstone. My car was standing here. Mr. Herndon walked to the front of it. I was standing near

the rear wheel of the car, and Mr. Touchstone was sort of back of the car, and Mr. Herndon was up at the front of the car. Q. Please state whether or not Mr. Touchstone made a statement to you that the statement made by the defendant, Mr. Herndon, with reference to the killing was true or false, such statement being in words as follows: Mr. Griffin cursed me for everything he could think of, all kinds of sons of bitches: I begged Mr. Griffin to go on and let me alone. I told him I didn't want him to hurt me and I didn't want to hurt him. Mr. Griffin was coming towards me. I kept backing back, and when he was in five or six feet of me, he put his hand in his pocket, and then I pulled my gun and shot him, or words to that effect? A. He did. Q. Did he or not, about two hours after the killing, near the rear of the drug store, in Pinetta, in response to a question asked him by you to tell you in his own way about the killing, then and there tell you that Mr. Herndon kept backing down the railroad telling Mr. Griffin to go on, that he did not want to hurt him and didn't want Mr. Griffin to hurt him; that Mr. Griffin kept cursing him for a son of a bitch and calling him a coward; that I said to Mr. Griffin 'Now stop this, there is no use to have any trouble;' that when I said this it seemed to make Mr. Griffin worse and he run his hand in his right pocket and Mr. Herndon pulled his gun and shot; and that I would have done it before Mr. Herndon did; and that at the time of the shooting they were five cross ties apart or words to that effect? A. Yes, sir, that is true; he did, sir. He was six cross-ties, if I remember right. After the homicide was reported to me I went to the scene of the killing, and after Mr. Herndon reported it to me I arrested him. I saw the dead man. Some one pointed out to me where Mr. Herndon was standing when he shot

and where the dead man was. I didn't measure the distance. I counted the spaces, the ties between where the men were standing, as the places pointed out to me. Bert Herndon pointed out the places to me. A track was there to show where they were standing. The heel where Mr. Herndon was standing was next to the crosstie, and I could not see but one and the heel was back this way towards Pinetta, traced north. And the other man's track showed me, where the other man was standing, he was facing this way where the track kind of turned, looked like he kind of stepped that way. Q. How far apart were they? The State Attorney objected to the question, upon the ground that it is self-serving. Whereupon the court sustained said objection, to which ruling the defendant excepted. Q. I will ask you this: Was there any sign there on the track as to where the two parties were standing? A. I saw tracks. One track was pointing north and one south. There was an indication in the track on the north, facing south, like it turned, like a person kind of turned making a track on the ground and sand. I did not, on that occasion, see but one set of tracks that indicated that they were pointing north and stopped at a certain place. I could tell that they had been coming backwards, because the heel would strike, that way, making a different track from what it would in walking forward. Q. How far from the dead man was that last track towards Pinetta that seemed to be coming backwards? The State Attorney objected to the question upon the ground that it had not been identified as the track of the defendant. By the Court: The witness says that was the only track. Witness: I didn't see but one track. The State Attorney renewed his objection. By the Court: I think, myself, it is too indefinite. The objection is sus-

tained, to which ruling of the Court the defendant excepted."

It will be observed from the foregoing testimony that this witness was not present when the fatal difficulty occurred and had no personal knowledge of what took place between the defendant and the deceased. All the information which the witness possessed as to the distance between the defendant and the deceased at the time of the shooting was derived from statements made to the witness by A. H. Touchstone, the defendant and possibly some one else. It is true that the witness testified that he went to the place of the tragedy after it had occurred and saw tracks there, but he did not identify such tracks, basing his information concerning them on what the defendant told him. Clearly the testimony sought to be elicited by these two questions was not admissible, and there is no occasion for further discussion.

It is insisted that the motion for a new trial should have been granted on the ground of newly discovered evidence, and it is claimed that the showing made meets the requirements of the rule laid down in Howard v. State, 36 Fla. 21, 17 South. Rep. 84, wherein we held: "Applications for new trial upon the ground of newly discovered evidence are looked upon by the courts with distrust and disfavor, and are granted only under the following restrictions: (1) The evidence must have been discovered since the former trial; (2) the party must have used diligence to procure it on the former trial; (3) it must be material to the issue; (4) it must go to the merits of the cause, and not merely impeach the character of a witness; (5) it must not be merely cumulative; (6) it must be such as ought to produce on another trial an opposite result on the merits. The party applying must make his vigilance apparent, for if it is left even

doubtful that he knew of the evidence, or that he might, but for the negligence, have known of and produced it, he will not succeed in his application." In addition to the prior decisions of this court which are cited in the opinion, also see the following subsequent opinions; Driggers v. State, 38 Fla. 7, text 18, 20 South. Rep. 758; Browning v. State, 41 Fla. 271, text 273, 26 South. Rep. 639; Long v. State, 42 Fla. 612, 28 South. Rep. 855; Mitchell v. State, 43 Fla., 584, 31 South. Rep. 242; Williams v. State, 53 Fla. 89, 43 South. Rep. 428; Enson v. State, 58 Fla. 37, 50 South. Rep. 948, 138 Amer. St. Rep. 92, 18 Ann. Cas. 940; Gilbert v. State, 61 Fla. 25, 55 South. Rep. 464; Williams v. State, 68 Fla. 88, 66 South. Rep. 424; Florida East Coast Ry. Co. v. Knowles, 68 Fla. 400, 67 South. Rep. 122; Kirkland v. State, 70 Fla. 584, 70 South. Rep. 592; Ryals v. State, 72 Fla. 38, 72 South. Rep. 369. In these cases will be found a discussion of the rule which we announced in Howard v. State, *supra,* which we have copied above, and the application thereof to the variant facts and circumstances as shown in such cases. We would also refer to instructive notes on page 609 of 14 L. R. A. and page 903 of 46 L. R. A. (N. S.), wherein many cases are collected from other jurisdictions bearing upon cumulative evidence as ground for new trial and the point is well discussed. We do not think that this newly discovered evidence as set forth in the affidavit of Emery Welch, which we have copied above, measures up to all the requirements which we have laid down. As we stated in the rule which we have adopted, "Applications for new trial upon the ground of newly discovered evidence are looked upon by the courts with distrust and disfavor" and are only granted under the restrictions which we there announced. Even if we assume that the affidavits of the defendant and his attorneys

30

show that they had used due diligence to procure this newly discovered evidence on the former trial, and that it is material to the issue, and that it can be said to. go to the merits of the cause, the evidence is not of such a nature that it ought to produce on another trial an opposite result on the merits. It would also seem to be merely cumulative. We find that the defendant testified in his own behalf as follows: "My name is Bert Herndon. I am the defendant in this case. I know W. T. Mann. I heard Mr. Mann's statement on the stand. I will go over it and tell you just the conversation me and Mr. Mann had on Thursday, sometime between eleven and twelve o'clock, close to noon, in Pinetta Supply Company, and I had heard of this rumor that I had been accused of selling liquor in his settlement, and I called Mr. Mann, said, 'Step here I want to talk with you.' We walked out the North-west door of the building and stepped around the corner just the least bit, and I said 'I understand there is a little rumor in your settlement that I have been selling liquor.' He said 'There is, Bert.' Called me Bert. I said 'I want to get you to tell anyone down there that you hear say that I sold liquor down there, that they are a damn liar and a son of a bitch.' And we talked on, and he said 'I will do it, deliver the message to anyone that I hear.' May not have said 'anyone,' but said 'I will deliver the message.'' I said 'have you any idea who started that rumor?' And he said "I have not.' I said 'I don't think there is anyone mad with me down there, except Mr. Griffin.' He said 'yes, there is, too; Mr. Will Hammock is too.' And I said 'I didn't know that.' And he said 'well he is.' And that was the conversation about the whiskey. And he made a step or two, like to that table, and stopped with his left hand and said 'whatever you do, Bert, you keep your eye on Mr. Griffin; you are going to have

trouble with that man.' That was all the conversation."

Mr. Downing, a witness introduced by the defendant, testified as follows:

"I know Bert Herndon and knew Mr. Henry Griffin in his life time. A short time prior to the death of Henry Griffin I was in the presence of Mr. Henry Griffin near Lamont in the south corner of Madison County, working with him down there. There was a conversation had with me at the time regarding Bert Herndon. He made a threat against Mr. Herndon at that time. Mr. Griffin said he could take a ten cent Barlow, not only himself, but any negro boy, and run Bert Herndon out of Pinetta, 'and as for Bert Herndon' said 'Bert Herndon ain't no man; he has been going to the express office taking packages of whiskey away from other people that didn't belong to him.' I said 'he has eh?' He said 'Yes.' He said if he ever fooled with him with that big pistol he had in his pocket, he would take it away from him and stamp him in the ground."

### CROSS-EXAMINATION.

"He said if Bert Herndon ever fooled with him with that big pistol on him, he would stamp him in the ground. He didn't say he would kill him, or cut or hurt him, just said he would take his pistol from and stamp him in the ground."

We see from the testimony of the defendant himself that he had been directly warned by Mann to keep his eye on Griffin, that he was going to have trouble with him, and from the testimony of Downing that Griffin had made threats against the defendant. The newly discovered testimony would simply have shown that other threats against the defendant had been made by the deceased. As was said by Mr. Justice BREWER in State

v. Kearley, 26 Kans. 77, text 89, "So far as the other matter disclosed by the affidavit is concerned, that of threats or ill-feeling of deceased toward defendant, it is not sufficient to justify a setting aside of the verdict. The fact of a preexistent ill-feeling was obvious on the trial; neither party was free from this ill-feeling. The new testimony would only make clearer that which was sufficiently disclosed upon the trial. Strictly, it was only cumulative, and cumulative testimony seldom if ever justifies any interference with a verdict. We cannot think that with this testimony the verdict would have been other than it was, and hence the verdict as returned ought not to be disturbed." Also see Malone v. State, 176 Ind. 338, 96 N. E. Rep. 1, and Williams v. Territory, 13 Ariz. 306, 114 Pac. Rep. 556.

It is suggested, rather than argued that the court erred in giving a portion of the charge to the jury which forms the 8th ground of the motion for a new trial, which we have copied above. Suffice it to say that no error is made to appear here. If the defendant desired that the jury should have been further instructed as to what constituted justifiable homicide, he should have specifically requested such instruction. As we held in Carr v. State, 45 Fla. 11, 34 South. Rep. 892: "Error can not be assigned of the Judge's failure to charge upon any question of law unless the party desiring it shall have requested charges thereon." Also see McDonald v. State, 55 Fla. 134, 46 South. Rep. 176; Padgett v. State, 64 Fla. 399, 59 South. Rep. 946, Ann. Cas. 1914 B, 897; Sykes v. State, 68 Fla. 348, 67 South. Rep. 121.

We have carefully examined the evidence and are of the opinion that it is amply sufficient to support the verdict rendered. Having found no reversible errors of

law or procedure, it follows that the judgment must be affirmed.

WHITFIELD and ELLIS, J.J., concur.

BROWNE, C. J., *dissenting.*—The view which I take of this case prevents me from concurring in the decision of the majority of the court.

In my opinion, the case should be reversed upon two grounds: First, because the court refused to permit Sheriff Stanton to testify as to the distance between the tracks of the deceased and the defendant, made at the time the fatal shot was fired—and, second, because the court refused to grant a new trial on the ground of newly discovered evidence. These are presented in the fourth and fifth, and the seventh assignments of error.

A. D. Stanton was the Sheriff of Madison County, and went with several others to the scene of the killing shortly after it occurred. He testified that someone pointed out to him where Herndon was standing when he shot, and where the dead man was; that a track was there to show where they were standing. The heel where Herndon was standing was next to the cross-tie  *  *  * and the heel was back this way towards Pinetta, traced north. The other man's track showed where the other man was standing. He was then asked: "How far apart were they?" and on objection by the State Attorney, the court refussed to permit the question to be asked, when the following occurred: "Q. I will ask you this: Was there any sign there on the track as to where the two parties were standing? A. I saw tracks. One track was pointing north and one south. There was an indication in the track on the north, facing south, like it turned, like a person kind of turned making a track on the ground

and sand.  I did not, on that occasion, see but one set of tracks that indicated that they were pointing north and stopped at a certain place.  I could tell that they had been coming backwards, because the heel would strike, that way, making a different track from what it would in walking forward.  Q.  How far from the dead man was that last track towards Pinetta that seemed to be coming backwards?   The State Attorney objected to the question upon the ground that it had not been identified as the track of the defendant.  By the Court:  The witness says that was the only track.  Witness:  I didn't see but one track.  The State Attorney renewed his objection.  By the Court: I think, myself, it is too indefinite.  The objection is sustained, to which ruling of the Court the defendant excepted."

The distance between the parties when the shooting took place was material.  As long as they were so far apart that Griffin could not by a sudden rush clinch with Herndon and prevent him from drawing his pistol in self defense, Herndon did not shoot.  It cannot be contended that Herndon shot because of vile epithets which Griffin applied to him immediately before the shooting, or for any other reason than in self defense, because Griffin had several times before this applied similar epithets to him, and Herndon could have shot him before Touchstone appeared on the scene, and there would have been no witness to the killing.  Herndon testified in part as follows:  "After I passed Mr. Griffin about as far as from the chair to the corner there I heard him say something, and I am a little hard of hearing, and had my left ear next to him, and I kind of stepped around, and he was standing facing me.  And I said 'what did you say Mr. Griffin?'   He said 'I want to know if you sold my boy any more liquor.'   I said Mr. Griffin I told you be-

fore I have never sold your boy any liquor, and it is strange you keep this matter up and I have only this much to tell you about that, your boy or any other boy that says I sold them liquor, they are damn liars.' And he said 'He said it, and if you say you didn't you are a God damn liar and a son of a bitch and threw his hand back to his pocket, and I pulled my pistol on him, like that, and kept my eye on him and it came slowly out of his pocket, and I saw his fingers was that way, and I dropped the pistol back in my pocket. I took my hand out of my pocket after I put the pistol back in my pocket. I was backing down the railroad and he was coming on me. He was cursing me for everything that a man could lay his tongue to, when he cursed me for a damn  son of a bitch I told him he was another.   And he kept coming on, and every once in a while I told him 'Go·on Mr. Griffin I don't want any trouble with you; let me alone, I don't want to hurt you or be hurt by you.'   And he kept coming, cursing me, and kept on that way until Mr. Touchstone came up."

The purpose of the testimony sought to be elicited by the question to which objection by the State was sustained, was to corroborate the testimony of defendant that he was backing away from the deceased, who was advancing on him, and was within six or eight feet of him when he shot, and to overcome the effect of the testimony of N. M. Thompson, a witness for the State, that the tracks showed that Griffin was at least fifteen feet away when Herndon shot him.   Thompson's testimony on this point is as follows:   "I remember the occasion of the killing of Mr. Henry Griffin on the railroad.   I was up there a short time after the killing where the killing occurred.   I walked up to the Sheriff, Stanton, who was making examination of the dead man's body, and Mr. Herndon was in the middle of a conversation how the

killing was done. Q. At that time and place, did you hear and see Mr. Herndon point out to the Sheriff where him and Mr. Griffin were standing at the time of the shooting? A. He was pointing out. As to whom he was pointing out to, I am unable to say, whether he was pointing out to me or the Sheriff. He pointed out where he was standing. I did not measure the distance from where he pointed out as to where he was standing to where the dead man lay. Mr. Herndon pointed out where he was and Mr. Griffin was, and it was ten spaces. Q. What was the distance? A. Eighteen inches, by standard railroad rules. I won't say that was the exact measurement; I only know the standard railroad rule. I counted ten of these spaces. That would make fifteen feet between the two points if the ties were laid to standard. I did not estimate the number of feet at the time, only by counting. On a standard railroad it would have been fifteen feet."

The distance between Griffin and Herndon when the latter fired the fatal shot, was very material, and that the State so regarded it on the trial is shown by the fact that the entire testimony of the witness Thompson was on that point, and his knowledge thereof was derived from the identical sources from which the Sheriff was asked to testify. Thompson, Sheriff Stanton and Touchstone were at the scene of the killing a short time after it occurred, and from what was then said, and from the tracks which were pointed out as the tracks of Griffin and Herndon, Thompson derived his knowledge of the distance between them and testified that they were about fifteen feet apart when the shot was fired. The Sheriff was asked to testify as to this distance, from the same source of information upon which Thompson formed his opinion, and he was not permitted to do so. Permitting

Thompson to testify on this point, and refusing to permit the Sheriff to testify on the same point, was error, harmful to the defendant.

The seventh assignment of error is based on the denial of the defendant's motion for a new trial. One of the grounds of the motion was that of newly discovered evidence. The defendant in support of this ground submitted the affidavit of one Emery Welch, as follows: "Before me personally appeared Emery Welch, who being by me first duly sworn, deposes and says: That about a mile and a half from the town of Pinetta, Florida, near Taylor & Brady's mill, about a week before Henry Griffin was killed, he had a conversation with said Henry Griffin; that in said conversation affiant said that they are having some trouble around Pinetta over the blind tigers, and Henry Griffin replied that there was only one man giving them any trouble, and that was that low down Bert Herndon; that he was going to put a stop to it; that if he ever caught Bert Herndon in the right place he was going to kill him, and that would put a stop to it all; and affiant said that if he were Griffin he would not have any trouble about it, and Henry Griffin replied that he did not care anything for the trouble, and that he was going to get rid of Burt Herndon; that Griffin repeated this threat several times in different words."

In the case of Howard v. State, 36 Fla. 21, 17 South. Rep. 84, Mr. Justice TAYLOR, who rendered the opinion, thus lays down the rule governing applications for new trial upon the ground of newly discovered evidence: (1) The evidence must have been discovered since the former trial; (2) the party must have used due diligence to procure it on the former trial; (3) it must be material to the issue; (4) it must go to the merits of the cause, and not merely to impeach the character of a

witness; (5) it must not be merely cumulative; (6) it is such testimony as ought to produce on another trial an opposite result on the merits."

It seems to be conceded by the opinion of the majority of the court that the application for a new trial on the grounds of newly discovered evidence, comes within the rule governing the same, in all but the fifth ground, in that the newly discovered evidence set forth in the affidavit of Emery Welch was merely cumulative. I cannot accept that view. There is no testimony of any threats by Griffin to kill Herndon, or to do him great bodily harm. Herndon testified that G. W. Mann told him "Whatever you do Burt, you keep your eye on Mr. Griffin; you are going to have trouble with that man." This was merely the opinion of the witness, and if the threat contained in the affidavit in support of the motion is cumulative, it becomes the doctrine of this court that the opinion of a witness as to the probability of an encounter between two persons is admissible to prove a threat. Only upon this theory could the testimony offered be regarded as "cumulative" of what Herndon said Mann told him.

Mr. Downing's testimony which is set out in the opinion, can in nowise be regarded as a threat to kill or do great bodily harm. It is true, this witness says: "He made a threat against Mr. Herndon at that time," but when he states what constituted the so-called threat, it proves to be the mere bombast of a bully, and instead of being a threat in the eye of the law, is a mere expression of Griffin's contempt for Herndon. Thus, "Mr. Griffin said he could take a ten cent barlow, not only himself, but any negro boy, and run Burt Herndon out of Pinetta." Only by that expediency of reasoning by which courts sometime construe "may" to mean "must," and "shall" to mean "may," can Griffin's boasting of what he or "any

negro boy" *could* do, be construed into "would" so as to make it a threat.

The only other statement credited to Griffin is that he said "if he ever fooled with him with that big pistol he had in his pocket,·he would take it away from him and stamp him in the ground." But he states most positively that Griffin *"didn't say he would kill him, or cut him, or hurt him,* just said he would take his pistol away and stamp him in the ground."

In the affidavit in support of the motion for a new trial, the threats were "If he ever caught Burt Herndon in the right place he was going to kill him," and "that he was going to get rid of Burt Herndon," which he repeated several times. For this to·be cumulative there would have to be some testimony of threats by Griffin to kill Herndon, or do him great bodily harm; but instead there is only the statement by Herndon that Mann told him to "look out for Mr. Griffin," and Mann's opinion that he was going to have trouble with him, and Downing's testimony about taking that big pistol away from him, and stamping him in the ground, and this witness was very careful to remove any impression that Griffin intended any bodily harm to Herndon by his highly figurative language, and added "he didn't say he would kill him, or cut him or hurt him, just said he would take his pistol away and stamp him in the ground."

· The testimony presented in the affidavit of Emery Welch can not in  the slightest degree be considered cumulative, unless we hold that the opinion of a witness, that one person is going to have trouble with another, is competent testimony to prove a threat, and that a contemptuous boasting of superior prowess and courage, even though coupled with positive testimony that he didn't say he would kill him, or cut him or hurt him, is a

threat to kill or do great bodily harm.    I cannot accept that view.

·    For the reasons set forth herein, I think the judgment should be reversed, and a new trial granted.

TAYLOR, J., concurs in the dissent of Chief Justice BROWNE, on the point of the rejection of the evidence of the Sheriff.