THE STATE OF KANSAS, *Appellee,* v. J. W. MURRAY, *Appellant.*

No. 16,663.

### SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*All Witnesses Whose Names are Indorsed on Information Need Not be Called.* On the trial of a criminal action the state is not obliged to examine all the witnesses whose names are indorsed on the information, and in a prosecution for assault with intent to kill it is not error for the court to refuse to require the state to examine the person assaulted, his name being indorsed on the information as a witness.

The State v. Murray.

2. EVIDENCE—*Defense of Mental Irresponsibility—Collateral and Immaterial Evidence.* The defense to a prosecution for assault with intent to kill was mental irresponsibility occasioned by seeing the person assaulted stealthily enter the defendant's home at night and hearing his wife's confession concerning her relations with such person. The defendant testified that he had previous information from the person himself, and from others, respecting the licentious conduct of such person with women other than the defendant's wife, and the defendant described the effect this information had upon his mind, in connection with what he saw and what his wife told him, on the night referred to. *Held,* the details of the person's licentious conduct with other women, as related by himself and others to the defendant, were not material. *Held,* further, that an offer of the defendant to show by a woman, who was a witness, that the person assaulted had tried to seduce her was properly denied.

3. —— *Same.* On the trial of the action referred to the wife of the defendant, as a witness in his behalf, related in detail her relations with the person assaulted as she told them to her husband on the night of her surprise. She told of salacious suggestions made to her by such person on a certain occasion. She was then asked if she assented to them, but was not permitted to answer. *Held,* the ruling was correct, because the issue was the defendant's mental condition following what she told him, and not her chastity.

4. —— *Matters of Common Knowledge—Difference between Solar and Standard Time.* On the trial in question the time when the moon set on a given night became relevant. The state introduced in evidence an almanac which stated that its calculations were given in solar time. *Held,* it was not essential to the admissibility of the evidence that it be accompanied by testimony explaining the difference between solar and standard time, the matter being one of common knowledge.

5. —— *Controversy Foreign to Issue Introduced by Defendant —Errors in Investigation Immaterial.* In the course of his relations with the defendant's wife the person assaulted told her of trouble the defendant had had with another woman, and that the defendant had paid money to fix it up. This conversation was included in the confession made to the defendant by his wife, and was narrated by her while on the witness stand as a witness in his behalf. The defendant proceeded to air the incident referred to before the jury, produced a witness who gave the details of the settlement with

the woman, and testified himself that he had not been guilty of adultery. The state in rebuttal produced evidence that the defendant had committed adultery with the woman, and that she did not understand the written terms of the settlement she made with the defendant. *Held*, the controversy thus introduced into the case by the defendant was wholly foreign to the issues on trial, and that any errors committed in its investigation are immaterial.

6. ———— *Hypothetical Question — Expert Opinion Based on Testimony of a Witness.* A medical expert heard the defendant's testimony and was asked to give an opinion respecting the defendant's sanity, "based wholly upon his testimony." *Held*, the question sufficiently indicated that the testimony was to be accepted as true and so made the foundation of the expert's opinion.

7. MANSLAUGHTER—*Fourth Degree—Voluntary Manslaughter at the Common Law.* Section 27 of the crimes act, which provides that "every other killing of a human being, by the act, procurement or culpable negligence of another, which would be manslaughter at the common law, and which is not excusable or justifiable, or is not declared in this article to be manslaughter in some other degre, shall be deemed manslaughter in the fourth degree," imports into the crimes act the offense of voluntary manslaughter at the common law.

8. ———— *Absence of Malice—Intent to Kill.* At the common law the absence of malice was entirely compatible with the intent to kill which voluntary manslaughter included, and this compatibility continues to characterize the offense as it appears by adoption in the crimes act.

9. ———— *Assault with Intent to Commit Manslaughter.* Section 41 of the crimes act, which provides that "every person who shall be convicted of an assault with an intent to commit any robbery, rape, burglary, manslaughter, or other felony, the punishment for which assault is not hereinbefore prescribed, shall be punished by confinement and hard labor not exceeding five years, or by imprisonment in the county jail not less than six months," creates the statutory offense of "assault with intent to commit manslaughter." As applied to manslaughter at the common law, this section means that if a person assault another under such circumstances that, should death ensue, the crime would be manslaughter at the common law, he shall be punished in the prescribed way.

10. ———— *Same.* If a person assault another with a deadly weapon, in heat of blood, upon reasonable provocation, without malice and without legal justification or excuse, but with

intent to kill, he may be convicted of assault with intent to commit manslaughter under section 41 of the crimes act.

11. CRIMINAL LAW—*Charge under Section 38 of Crimes Act—Conviction under Section 41.* A person charged with an assault on purpose, of malice aforethought and with intent to kill, under section 38 of the crimes act, may be convicted of an assault with intent to commit manslaughter under section 41 of that act.

Appeal from Jackson district court.  Opinion filed July 9, 1910.  Affirmed.

*J. K. Codding, Guy L. Hursh,* and *Charles Hayden,* for the appellant.

*Fred S. Jackson,* attorney-general, *Charles D. Shukers,* special assistant attorney-general, *M. A. Bender,* county attorney, and *Crane & Wodburn Brothers,* for the appellee.

The opinion of the court was delivered by

BURCH, J.: The appellant was charged with assaulting and shooting Bert Graham on purpose, with malice aforethought and with intent to kill, under section 38 of the crimes act. He was convicted of assault with intent to commit manslaughter, under section 41 of the crimes act, and appeals. There are ninety-seven assignments of error, few of which are worthy of notice.

The appellant, who is a physician, became suspicious of his wife. He went away leaving her under the impression that he would be gone several days, came home the same night, saw Graham enter the house by the kitchen door, rushed in, but was unable to effect a capture. His wife confessed in detail to a long siege Graham had made of her affections and her chastity, which, however, she had not surrendered. The appellant suffered the most poignant mental distress throughout the night, in the course of which he drank considerable whisky. The next morning he went to his

office, but could not free his mind of the night's occurrences. Graham was a liveryman who made it a practice to meet incoming trains. Leaving his office and taking a revolver with him, the appellant went to the Rock Island depot, where a number of persons were waiting for the arrival of a south-bound train. Seeing Graham, the appellant began shooting. Graham seized a bystander, whom he attempted to hold between himself and the appellant. The appellant called to the bystander two or three times to get out of the way, and in the meantime refrained from shooting. Graham and the bystander struggled together and fell to the ground. Finally Graham ran, the appellant shooting at him and calling to him to stop. Altogether the appellant fired four shots, one of which caused a flesh wound in Graham's arm. The defense to the action was that the appellant acted under the influence of an insane and uncontrollable impulse which relieved him of criminal responsibility.

The state's evidence was quite brief, and consisted of the testimony of several witnesses who saw the encounter and of the doctor who dressed Graham's arm. Graham's name was indorsed on the information as a witness, but he was not called. A motion by the appellant to require the state to examine Graham was properly denied. Every fact and circumstance necessary to establish the charges of the information was presented, and whatever the rule may be in some states it is not the law in this state that all witnesses whose names appear on the information must be called.

The appellant placed his wife, Rebecca Murray, on the witness stand in his defense. She gave a complete history of her relations with Graham, and of the occurrences of the night before the shooting, including the story she told her husband, and its effect upon his mind and conduct. There are numerous assignments of error relating to her examination and cross-examination which seem quite trivial. For example: One even-

ing while the appellant was in Texas, Graham met Mrs. Murray on the street and asked to call that night. She said: "Oh, I'm scared to." He said he thought it would be all right. She went home, and after reflecting on the matter made up her mind the meeting ought not to occur. Her testimony was that she thought: "He must not come here. This must not happen. I must do something to stop it." Therefore she ordered a livery team and drove to her brother's in the country.. After all this she was asked why she went to her brother's that night. An objection to the question was sustained, and it is now argued that the verdict and judgment ought to be overturned because of the ruling. Again: She testified to salacious suggestions Graham made to her on a certain occasion. She was asked if she assented to them. An objection was properly sustained, because the question to be tried was the state of the appellant's mind, and not her chastity. Afterward she testified fully to the fact that she had never yielded to Graham's advances. Yet the appellant harks back to this question, irrelevant when asked and utterly immaterial now, and asks that the verdict and judgment be overturned because it was not answered.

The appellant was a witness in his own behalf. He was permitted to testify that he knew Graham was possessed of a licentious character. He said he had received information from Graham personally, and from others, respecting licentious conduct on the part of Graham with women other than the appellant's wife, and he described fully the effect this information had upon his mind, in connection with the events of the night before the shooting. When he was asked to give the details of what Graham told him an objection was interposed and sustained. The ruling was clearly correct. The testimony he was allowed to give accounted fully for the state of his mind, the only matter at issue. It was enough, under the circumstances, that he possessed definite information from a reliable source that

Graham was a seducer of women. To have gone further would have introduced a brood of collateral issues wholly foreign to the one under investigation. An offer to show by a woman that Graham had attempted to seduce her was properly excluded for the same reason.

The position of the state was that the appellant was altogether too deliberate, self-controlled and discriminating in his shooting to be under the influence of an insane passion, and in order to discredit the appellant's account of what shattered his mental integrity the state attempted to create a suspicion of an alibi for Graham. The appellant and his wife testified that Graham came at a certain time of the night. The appellant said the moon was shining, and he was corroborated by other testimony. In rebuttal the state offered in evidence an almanac showing the time the moon set. The almanac stated that its calculations were given in solar time. The almanac was properly admitted in evidence, but it is said the difference between solar time and the standard time in general use was not explained to the jury. The matter was one of common knowledge, and the appellant might have explained it to the jury himself, even in the argument of the case, had he thought about it at the trial.

Two witnesses, Isaac Mulford and Effie Mulford, gave accounts of Graham's whereabouts until after ten o'clock of the night before the shooting. On cross-examination Mulford was asked concerning a subsequent conversation he had with Ellen Brewer. He admitted having the conversation, and admitted he might have said he saw Graham that night and might have talked about sitting on the porch at his home that night, but he would not declare he did so. Ellen Brewer was called by the appellant and asked to state all she remembered of the conversation with Mulford, which she did. The appellant then undertook to cross-examine her by means of leading questions, the answers to

which would not have impeached Mulford in view of the nature of his answers. Objections to such questions were properly sustained under well-known rules.

In the course of her testimony for the appellant Mrs. Murray stated that on a certain occasion she met Graham, by appointment, in North Topeka. Proceeding, she said:

"In the conversation that followed he asked me why I did not go to South Dakota and stay six months. I told him I had no reason to do that and he said he could give me a reason to do so. He stated that he knew some reasons and things about the doctor that would change my mind. I do not remember whether I said 'Don't tell me' or· 'Do tell me.' He said, 'I do not know whether I should tell you, as it would be betraying the doctor, but I will tell you anyway. I am telling it all—between the doctor and the Fultzes. That the doctor had had trouble with Fultz's wife and had to pay over some money and that he and Fenske had fixed —had helped to fix it up; that Fenske had fixed it up; that he was a go-between."

The appellant seemed to feel the need of clearing up the Fultz matter before the jury, and so volunteered the testimony that since his marriage he had not committed adultery with any woman whomsoever. Not content with this, he placed Fenske on the stand and caused him to tell all about the settlement of the Fultz affair, and Fenske produced and read to the jury the Fultz receipt for the money the appellant had paid to repress scandal. The state, of course, walked briskly in at the open door and proved by Mrs. Fultz that the appellant had sexual intercourse with her in his office, whither she had gone for medical treatment, and ·that she did not understand the terms of the receipt for money which she had signed. Many errors are assigned relating to the trial of this separate and independent Fultz case. None of them, if any were committed, bore any sort of relation to the only matter in dispute—the state of the appellant's mind when he was

engaged in shooting at Graham—and they need not be noticed further.

Doctor Roby, a witness for the state in rebuttal, testified that he heard the appellant's testimony. He was then asked as a medical expert for an opinion respecting the appellant's sanity, "based wholly upon his testimony." It is argued that the witness was left free to weigh the truth or falsity of the appellant's testimony, and to accept or reject such portions of it as he saw fit. The natural import of the question is that the witness should accept the testimony just as the appellant gave it and make it the foundation of the witness's opinion.

Other objections to medical expert testimony which was given are unsubstantial, and other assignments of error respecting the admission and exclusion of evidence are without merit.

One matter of importance, arising upon the instructions, is presented. The verdict reads as follows:

"We, the jury empanelled and sworn in the above-entitled case, do upon our oath find the defendant, J. W. Murray, guilty of an assault with intent to commit manslaughter, under section 41 of the crimes act, as charged in the amended information."

Section 41 of the crimes act reads as follows:

"Every person who shall be convicted of an assault with an intent to commit any robbery, rape, burglary, manslaughter, or other felony, the punishment for which assault is not hereinbefore prescribed, shall be punished by confinement and hard labor not exceeding five years, or by imprisonment in the county jail not less than six months." (Gen. Stat. 1909, § 2529.)

This section of the crimes act was applied to the evidence by means of the following instruction:

"(15) If you find from the evidence in this case that defendant, at the time and place charged in the amended information, unlawfully assaulted and wounded said Bert Graham, with a deadly weapon, as charged in the amended information, and further find that said assault was made upon reasonable provocation, in heat

of blood, but without malice and without legal excuse, and with intent to kill, then you will be justified in finding defendant guilty of an assault with intent to commit manslaughter."

In order that the conviction may be sustained it must be held that there may be an assault with a deadly weapon, upon reasonable provocation, in heat of blood, without malice and without legal excuse, and with an intent to kill; and it must be held that such an act constitutes an assault with intent to commit manslaughter within the meaning of section 41 of the crimes act. The appellant argues that such a ruling would involve an impossibility of fact and of law. The court is of a contrary opinion.

In the preparation of the crimes act the legislature segregated certain homicides, committed under specified conditions, and called them justifiable. It did the same with certain other homicides, committed under specified conditions, and called them excusable. By this means certain specific killings are exempt from punishment. Conceiving that there may be other killings which ought not to be punished, the legislature then exempted all other homicides which were justifiable or excusable under the common law. (Crimes act, § 11, Gen. Stat. 1909, § 2499.) While all these exemptions are statutory, they may, for convenience, be classified as statutory and common-law exemptions.

The legislative intention was to punish all homicides which are not justifiable or excusable, either under the statute or under the common law. In providing a scheme of punishments the same method was adopted as in the case of exemptions. A homicide committed under certain specifically enumerated conditions was made punishable as murder in the first degree. Another kind of killing under certain other specific conditions was made punishable as murder in the second degree. Various kinds of homicides, the elements of which are all named, constitute manslaughter in the first degree, and so with manslaughter in the second,

third and fourth degrees. Understanding very well that it had not, in two degrees of murder and four degrees of manslaughter, provided for all punishable killings, the legislature then undertook by section 27 of the crimes act to cover all those which had not been specifically provided for. That section reads as follows:

"Every other killing of a human being, by the act, procurement or culpable negligence of another, which would be manslaughter at the common law, and which is not excusable or justifiable, or is not declared in this article to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree." (Gen. Stat. 1909, § 2515.)

It may be that the statement preceding the quotation is too broad, and that if there should be a homicide of some kind not covered by the statute which would be murder and not manslaughter at the common law it could not be punished; but it is possible that in such a case the manifest purpose of the section to include all homicides not justifiable or excusable and not otherwise specifically covered would control the phraseology.

By section 27 common-law manslaughters not already provided for by the crimes act are imported into the act and so become statutory crimes, but here again, for convenience of reference, the terms "statutory" and "common law" may be applied as manslaughters fall without or within section 27. Turning to the statutory manslaughters, it is discovered that several of them include an intent to kill—the willful killing of an unborn quick child by an injury to the mother which would be murder if her death should result (§ 14, Gen. Stat. 1909, § 2502) ; the administration of medicines, drugs, or other substances to a woman quick with child, with the intent to destroy the child, if the death of the child or of the mother ensue (§ 15, Gen. Stat. 1909, § 2503) ; the unnecessary killing of another, either while resisting an attempt by the other to commit a felony or other

unlawful act, or after the attempt has failed (§ 17, Gen. Stat. 1909, § 2505). In these cases there may be an assault with intent to commit statutory manslaughter, involving an intent to kill.

In the case of *The State. v. Tankersley,* post, p. 165, the opinion reads:

"This is an appeal from a judgment of conviction of an assault with intent to commit manslaughter in the second degree. The information charged an assault with intent to murder. One of the claims of error is that a conviction of assault with intent to commit manslaughter is a legal impossibility, because manslaughter is involuntary killing, not killing by design. To this it is sufficient to say that assaults with intent to commit manslaughter are among the offenses defined by the law (Gen. Stat. 1897, ch. 100, § 40), and under section 17 of this chapter, which defines one of the instances of manslaughter in the second degree, it is entirely possible to commit the offense with a specific intent to kill."

The compilation called General Statutes of 1897, referred to in the foregoing opinion, is the Webb edition. Section 40 of chapter 100 of its classification is section 41 of the crimes act, and section 17 is section 17 of the crimes act.

There are no statutory manslaughters involving an intent to kill except those referred to in sections 14, 15 and 17. None of them will fit all the facts set forth in the fifteenth instruction, and if there be a manslaughter involving the elements there enumerated it must be found in the common-law group. Turning to the common law, one of the established classes of manslaughter, that termed voluntary, is found to involve the intent to kill. Besides this, in the case of voluntary manslaughter at common law the killing must have been done in the heat of passion, upon sufficient provocation and without malice, and must have been unlawful—that is, without legal justification or excuse. (2 Cooley's Black. p. *191.) This is the precise state of

facts submitted to the jury in the fifteenth instruction. The crimes act may be searched in vain for any statutory degree of murder or manslaughter under which such a killing is punishable. Here, then, is a common-law manslaughter which the legislature must have intended to cover by section 27. If the intent to kill should fail of accomplishment and death should not ensue, there remains an assault with an intent to do that which, completed, is manslaughter, and which, therefore, must be punishable under section 41.

It is argued that an intent to kill, where the killing is not justifiable or excusable, is an intent to do a wrongful act, and that, under the definition of malice as the state of mind denoted by the intentional doing of a wrongful act, it is impossible that there should be an intent to kill and no malice. The supposed difficulty thus presented is one of words only, and arises from an attempt to make a convenient expression, good for all general purposes, cover a particular case which the common law has always carefully discriminated. At the common law homicides were of two classes only—those done with malice and called murder, and those done without malice and called manslaughter. This malice, or its absence, was inferred from facts and circumstances. Given a killing done voluntarily—that is, with the intent to kill, but in hot blood and upon some sudden and sufficiently violent provocation, and the inference of malice was not drawn. Going beyond these facts there might be malice—as, if the provocation were resented in a brutal and ferocious manner, indicating that the conduct exhibited was the dictate of a wicked, depraved or malignant heart. But, without circumstances of some kind showing such malevolence, due provocation and hot blood alleviated the crime into the nonmalicious one of manslaughter. (4 Cooley's Black. p. *201). When the legislature imported common-law manslaughter into the crimes act this characteristic came with it.

In applying the general definition of malice the court, in its instructions, maintained fairly well the distinction between conduct proceeding from a sedate and deliberate mind or malignant heart and conduct proceeding from a sudden impulse of passion under circumstances giving provocation. Some faulty expressions occur, probably through an effort to make a large subject clear in a few words, but on the whole there is no reason to believe the jury were misled.

It will be observed that the crime of which the appellant was convicted is included with a number of others requiring a specific intent—as, to rob, rape, or burglarize. Consequently it is argued that a deliberate intent to commit the specific crime of manslaughter must have been entertained, and that such deliberation is incompatible with manslaughter. The case of *People v. Lilley*, 43 Mich. 521, sustains this view. The opinion reads:

"In cases of assault with intent to commit a felony a specific intent must be found to exist, and it is very difficult to imagine how such a specific intent can be found to exist in the absence of reflection and deliberation. When once it appears that the assault was made with intent to take life, under circumstances where the killing would not be lawful or excusable, then, if under such circumstances death should ensue, the party would be guilty of murder. It seems like a contradiction of terms to say that a person can assault another with intent to commit manslaughter." (p. 529.)

To apply this reasoning to section 41 would be to stick in the bark of the letter of the statute and not to penetrate to the heart of the legislative meaning. What the statute does in reference to the particular subject under discussion is to declare that if a person assault another under such circumstances that if death should ensue the crime would be manslaughter at the common law, he shall be punished in a prescribed way. In the

11—83 KAN.

case of *The State v. O'Shea,* 59 Kan. 593, the opinion reads:

"The essential difference between sections 39 and 40 is that section 39 requires that the assault be made on purpose and of malice aforethought, with intent to kill, while section 40 defines a lower grade of offense, in which the element of malice aforethought is not included. In order to sustain a conviction under section 40 it is only necessary to prove that the assault was made under such circumstances as would have constituted manslaughter if death had ensued." (p. 595.)

The references in this quotation are to sections 39 and 40 of chapter 100 of the 1897 compilation of the statutes, which are sections 38 and 41 of the crimes act.

The matter under consideration was much clarified by the supreme court of Maine in the case of *State v. Herson,* 90 Maine, 273. The syllabus reads:

"The statutory term of assault with intent to commit manslaughter means an assault with an intent to commit an act which, if committed, would constitute the offense of manslaughter."

In the opinion it was said:

"It is urged that the terms, an assault with intent to commit murder, or to commit manslaughter, are illogical and not intelligible to common minds. But we think the difficulty disappears when accompanied with the explanation that an assault of that kind means with the intention to commit such criminal acts as would, when committed, amount to the one crime or the other. It is not to be supposed that any criminal really appreciates in his own mind, when meditating the commission of crime, the exact degree of the offense he may be guilty of, whether murder in the first or second degree or manslaughter, and that can only be determined by the result of his criminal act." (p. 275.)

The appellant cites the case of *The State v. White,* 41 Iowa, 316, in which it was held that an indictment for an assault with intent to commit murder will not sustain a conviction for an assault with intent to commit manslaughter. The opinion in this case was inadver-

tently published, contrary to a rule of the court, while a petition for a rehearing was pending. On the rehearing an opposite conclusion was reached. (*The State v. White*, 45 Iowa, 325.)

In the case of *The State v. Moran*, 46 Kan. 318, 321, the broad general statement was made, upon the authority of *People v. Lilley*, 43 Mich. 521, and *The State v. White*, 41 Iowa, 316, that "where an assault is made by a person with intent to take the life of another, and the killing is not lawful or excusable, if death should ensue, the party would be guilty of murder." (p. 321.) From what has been said it is perfectly clear that this statement is not true. In the sentence succeeding the one quoted from Moran's case it was said that if the assault be made with intent to commit murder there can be no conviction of assault with intent to commit manslaughter. Considered as an application of the law to a given state of facts, the statement is true, because there must be malice in murder and can not be malice in manslaughter.

In the case of *Williams v. State*, 41 Fla. 295, the opinion reads:

"It will readily be perceived by an analysis of the language of these statutes that there is nothing in the definition of manslaughter to exclude from its provisions all *intentional* homicides, or to include within the definition of murder all *intentional* killings, unless the intention is so deliberate as to amount to a premeditated design. The ordinary case of a sudden combat, where the passions are aroused by sufficient provocation, will furnish a pertinent illustration. Here there may be an intent to take life, accompanied by an assault with a deadly weapon to carry out that intent. If the intent does not rise to the degree of a premeditated design, the killing will not be murder, but manslaughter. If the act does not result in death, why will not the party be guilty of an assault with intent to commit a felony, to wit, manslaughter? We think he will be, and in this conclusion we are sustained by the following authorities. [Citing cases.]" (p. 299.)

In the case of *The State v. Brock,* post, p. 167, the opinion reads:

"Andy Brock was charged with assault with a deadly weapon with intent to commit manslaughter, under section 38 of the crimes act, and convicted of assault with intent to commit manslaughter, under section 41 of that act. In his appeal he contends that the judgment of conviction was not warranted by the information, evidence or verdict. The crimes act provides that upon a trial the accused may be found guilty of an offense included in the one charged. Assault with intent to commit manslaughter is included in the charge made against the defendant, and, as to the intent to kill stated in the information, it may be said that there are degrees of manslaughter where an intent to kill may exist. Assault with intent to commit manslaughter, of which the defendant was convicted, is not necessarily inconsistent with the charge of assault with intent to kill."

The statement that there are degrees of manslaughter where an intent to kill may exist is not entirely adequate. Degrees of manslaughter are statutory only, and not only are there statutory degrees of manslaughter where an intent to kill may exist, but there is also voluntary manslaughter at the common law, which includes such an intent, and which is incorporated in the crimes act by section 27.

The appellant argues that if he were not mentally responsible he was guilty of no crime whatever, and if he were mentally responsible he was guilty of assault with intent to kill, as charged in the information. It is clear that the jury believed he was able to distinguish right from wrong, and so, under the repeated decision of this court, had mental capacity to commit crime; but the jury apparently accepted his testimony that he acted in a transport of passion, caused by seeing Graham invade his home at night and hearing his wife's story, and apparently accepted his testimony that he was held in the grip of such passion continuously from

the time Graham entered the house until the shooting took place. If the jury took this view of the evidence it was very lenient to the appellant, and he is not in a position to complain.

The jury were properly instructed respecting the presumption of innocence and upon the subject of intoxication. Errors in the giving or refusing of instructions relating to other offenses or other degrees included within the main charge are not now material. The uncontrollable-impulse excuse for crime has been rejected so often by this court that it will not be discussed here. Instructions are to be considered together, and the seventeenth instruction does not eliminate the question of the appellant's sanity. Other errors assigned relating to the giving and refusing of instructions are not of sufficient merit to require a reversal. The finding of the trial court is conclusive upon the question of misconduct on the part of the jury.

The judgment of the district court is affirmed.