No. 26,727.

THE STATE OF KANSAS, *Appellee*, v. FRANK HARDISTY, *Appellant*.

SYLLABUS BY THE COURT.

1. HOMICIDE—*Instructions as to Degrees of Murder—Sufficiency of Evidence —Misconduct of Counsel.* In an action charging the defendant with murder in the first degree, where the jury, being given the opportunity to find him guilty in the second degree, returned a verdict of first-degree murder, the proceedings considered, and *held*: (*a*) Under the facts narrated in the opinion, the trial court committed no error in refusing instructions covering the several degrees of manslaughter. (*b*) The evidence was sufficient to support the verdict. (*c*) It was not error to refuse a new trial because of alleged misconduct of counsel in presenting the state's argument to the jury.

2. SAME—*Trial Generally.* Various alleged errors considered and held not to require a reversal.

Appeal from Osage district court; ROBERT C. HEIZER, judge. Opinion filed October 6, 1926. Affirmed.

*A. E. Crane, Edward Rooney, B. F. Messick, A. H. Crane,* all of Topeka, *A. B. Crum,* of Lyndon, *E. T. Riling* and *John J. Riling,* both of Lawrence, for the appellant.

Criminal Law, 17 C. J. p. 352 n. 57. Homicide, 29 C. J. pp. 1092 n. 21, 1109 n. 79, 1111 n. 6, 1128 n. 6, 1134 n. 64; 30 C. J. pp. 312 n. 42, 337 n. 86, 382 n. 94, 396 n. 23, 414 n. 79; 21 A. L. R. 603; 27 A. L. R. 1097; 13 R. C. L. 936.

*Charles B. Griffith,* attorney-general, *Roland Boynton,* assistant attorney-general, *A. K. Stavely,* county attorney, and *J. J. Schenck,* of Topeka, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The defendant was convicted of murder in the first degree and appeals.

The tragedy was the result of a controversy over the grading of a road. The facts were, substantially, as follows: The defendant was the owner of a large farm in Osage county lying on either side of a county highway known as the Overbrook-Richland road. His home was located on the west side of the highway and a tenant house on the east side. He had constructed several driveways from this county highway into his premises—one from the highway just south of his home around its rear and back into the highway just north, another from the highway to the barn, which was a short distance north of his house, and two others to the land on the east side of the road. North of the barn was a stone fence which ran east to a hedge fence along the west side of the highway. There was a gap in this hedge fence about 200 feet north of the barn, which was used as an entrance to a field from the highway. At the driveway south of defendant's house there was a wooden culvert across the ditch on the west side of the road. At all of the other entrances defendant had filled the ditches with rocks to enable him to pass in and out. On June 9 and 10, 1924, a county road-grading crew, in charge of Dell Herlan, as foreman, and including in its number the deceased, Henry (Dude) Hupp, was grading this county highway. The machinery in use consisted of a large tractor driven by Frank Tucker, pulling a large grader which was operated by the deceased. Hitched to the rear of the large grader was a small grader which was operated by Fred Montgomery. The tractor traveled just to the right of the center of the road and the two graders worked partly in the ditch at the side of the road. Other members of the crew followed behind the machinery clearing out the rubbish and brush.

On the afternoon of June 9 the grading crew, working north on the east side of the road, graded out the rock fills at the entrances near defendant's tenant house. Defendant was away from home at the time, but returned soon afterwards. He followed the crew about half a mile north, where he protested against the removal of these

rock fills. A controversy occurred between the defendant and Herlan, the foreman, which ended in a fight. Herlan informed defendant that he expected to take out the other fills, and defendant replied that they should not take out any more rock, and that he would be there the next day. Later in the afternoon the defendant endeavored to procure the advice of his attorney, also the county attorney, and subsequently, at the suggestion of a friend, went to a justice of the peace in Overbrook and secured a so-called "injunction," which was served on Herlan that evening. The difficulty was discussed at defendant's supper table that evening. Defendant stated that they would not take out any more rock; that he would be there and see that they did not go through. His wife and hired man, Frazier Owen, advised him not to have any trouble over the matter. There was similar talk by the same parties at the breakfast table on the morning of June 10. After breakfast, and before the grading crew had returned to work, the defendant went north on the road to where the machinery had been left the night before. About seven o'clock he and Owen went to work some distance from the house. Before leaving, the defendant told his wife that he would be at the road when they (the graders) came back. About an hour and a half before the tragedy, defendant instructed Owen to tie his horses in the field and return to the house with him "to hear what was said." On their return, Owen busied himself with chores while the defendant busied himself about the barn, where his shotgun was kept, watching for the graders.

About 10:30 a. m. the graders were heard approaching from the north, grading the west side of the road. The defendant climbed over the stone wall north of the barn with his gun in his hand, and proceeded north to the gap in the hedge fence. The gun was loaded. On his arrival he put the gun down, leaning it against the post at the south side of the gap. His wife went from the house up the road to the gap and seated herself on the north end of the rock fill in the ditch, in front of the gap. The graders advanced until the tractor had passed Mrs. Hardisty, and the front wheels of the front grader were within three or four feet of her, when the machinery was stopped. When the tractor passed the gap the defendant was holding the gun in his hand. Just before the machinery stopped, Hupp jumped off the front grader and passed between it and the hedge, advanced toward the defendant who had taken a position at or in

front of the gap. As Hupp approached the defendant stepped out and pointed the gun at Hupp's stomach and ordered him to stop or he would kill him. Hupp was on friendly terms with the defendant and had expressed himself that morning as not expecting any trouble. He requested the defendant to put the gun down, as he wanted to talk with him. There was some conversation and the defendant stated that they were not going through, and to pull around the fill. There is a slight variation in the testimony as to just what was said. The state's evidence showed that Herlan had come up from the rear of the machinery and gave instructions to pull out and go around the obstruction; that Hupp, who had been about six feet from the defendant, left and went out to the road, saying, "No, let it set and call the sheriff"; that the defendant was cursing the crew; said he would kill the first man who moved the rocks; that Hupp, who by this time had stepped to the other side of the grader tongue, and was about fifteen feet from Hardisty, turned and threw up his left hand and said, "You son-of-a-bitch, you would not shoot a man in cold blood"; that the defendant took deliberate aim and fired, the charge striking Hupp in the left eye and he fell to the ground dead. There was evidence that Herlan knelt and raised Hupp's head to examine the wound. That the defendant immediately reloaded his gun, aimed it at Herlan as he was kneeling beside the corpse, then lowered it, then aimed again at Herlan and said: "You called me a son-of-a-bitch yesterday; call me one to-day. I want to kill you, you son-of-a-bitch." That Herlan replied that he was not calling him one to-day, and went down the road north. That the defendant then gave his gun to his wife, and followed Herlan, saying, "Herlan is the son-of-a-bitch I wanted." That the defendant then went to the body of Hupp, stooped to look at it, straightened up, stooped again, took a good look and said, "You son-of-a-bitch, I am a man of my word."

The defendant and his wife returned to the house, and a few minutes later went to Overbrook, where the defendant surrendered to Hugh Allen, a deputy sheriff.

The court instructed the jury as to murder in the first and second degrees. The defendant contends that the court erred in refusing to instruct also on manslaughter.

The sufficiency of the instructions is always to be tested by the evidence in the case. (*State v. Curtis*, 93 Kan. 743, 145 Pac. 858.)

While the weight of the evidence is for the jury, it is the duty of the court to advise them as to the rules of law which govern its consideration. The court may not decide whether or not certain evidence is worthy of belief, but must always scan it to determine what rules shall govern the jury in its consideration. The court must settle the question as to whether any fact in evidence requires that the jury be informed as to some particular rule of law which applies to it. The court should not indulge in speculation, nor instruct the jury upon mere possibilities which might tend more to bewilder than to enlighten. While the instructions should cover all probable interpretations of the evidence, they should not cover questions which, though possible under the information, are not, in fact, presented by the evidence. (*State v. Rhea*, 25 Kan. 576; *State v. Hendricks*, 32 Kan. 559, 566, 4 Pac. 1050.)

The rule is that "Where the defense is self-defense and there is some substantial evidence that would tend to mitigate the homicide to manslaughter, however weak and inconclusive such evidence may appear to the court, it is error to refuse to instruct the jury concerning manslaughter" (*State v. Buffington*, 66 Kan. 706, 72 Pac. 213), and "Where there is even slight evidence that the offense committed may have been of a lower degree than the one charged, it is the duty of the court to give the law of such inferior offenses; but the court cannot properly instruct a jury upon a degree of the offense which the evidence does not tend to prove." (*State v. Mize*, 36 Kan. 187, 13 Pac. 1.) Also that "The court should instruct as to every degree of the crime charged of which the evidence naturally suggests the defendant may probably be guilty, and if, by request for further instruction, the attention of the court is challenged to any other degree of the crime upon which the jury could be justified in finding the accused guilty upon any reasonable construction of the evidence, the court should further instruct as to such degree." (*State v. Newton*, 74 Kan. 561, 567, 87 Pac. 757.)

The court must examine the evidence as a whole, and then instruct upon such questions as the evidence naturally, reasonably and probably tends to prove. It cannot properly instruct as to any degree of the offense which the evidence does not tend to prove. (*State v. Estep*, 44 Kan. 572, 24 Pac. 986; *State v. Mowry*, 37 Kan. 369, 15 Pac. 282; *State v. Kornstett*, 62 Kan. 221, 61 Pac. 806.)

"It is true that generally, a charge of murder in the first degree in the common form will include a charge of murder in the second degree, and the court

must instruct the jury on all matters of law necessary for its information in returning a verdict; but the court is not required to instruct with reference to a lesser degree unless there be evidence warranting a reasonable inference of guilt in that degree." (*State v. Roselli,* 109 Kan. 33, 40, 189 Pac. 195. See, also, *State v. Clough,* 70 Kan. 510, 79 Pac. 117; Notes 21 A. L. R. 607; 27 A. L. R. 1098.)

"Manslaughter is distinguished from murder by the absence of malice as a constituent element." (*State v. Clark,* 69 Kan. 576, 580, 77 Pac. 287; *State v. Ireland,* 72 Kan. 265, 83 Pac. 1036.)

To constitute malice, the intent to kill must be the product of a sedate, deliberate mind and formed design, and not the result of hot blood upon sudden and sufficient provocation. (See *State v. Murray,* 83 Kan. 148, 110 Pac. 103. Also, *Craft v. State,* 3 Kan. 450, 482; *State v. McGaffin,* 36 Kan. 315, 13 Pac. 560.)

"Since legal malice does not require ill will toward the victim, the crime may be murder, and murder although the person killed was not the one whom defendant intended to kill." (29 C. J. 1092.)

Nor is it essential that the intent to kill be unconditional. The defendant argues that he shot in self-defense. Some of defendant's statements, if considered alone and apart from his other statements and apart from the other evidence, might, by a stretch of the imagination, indicate that he shot in self-defense, but not otherwise. When considered in connection with the other evidence, the surroundings and circumstances, we are convinced there was sufficient evidence of an intent to kill "with that sedate, deliberate mind and formed design" which constitutes malice.

In the following will be found the defendant's most favorable statements supporting his theory of self-defense.

"I picked the gun up when Hupp jumped off the grader. I held it in one hand part of the time and part of the time in two. I think I had it in my right hand most of the time. I don't know how long I held it before I pointed it at anyone. I pointed it at Dude Hupp. He was right up close to me. I had the gun on his stomach. He never offered to hit me. After he walked away he turned and called me a son-of-a-bitch and started for me. He held his fist and said, 'You son-of-a-bitch, shoot me.' I shot him right after he dared me to shoot. When I shot I thought that Hupp and Herlan were going to attack me. When I shot Hupp that morning I shot to kill."

Mrs. Hardisty testified:

"Hupp turned and crossed the crossing [going out into the road]. He turned towards Frank and raised his hand and took a step and said, 'You son-of-a-bitch, shoot.' He had taken one step to the west. I said, 'Please don't, Mr. Hupp.' He never replied to me. He only spoke to Frank. Then Frank shot."

All the evidence, when considered together, discloses no reasonable basis to support the defendant's contention that he was in danger of attack. Hupp, according to defendant's own testimony, had come to within five or six feet, but had not offered to strike; had then left, gone back into the road and even across to the other side of the grader tongue. Herlan had just said, "Boys, get on the grader and raise the plates up; we will pull around and leave it go; we don't want to have any trouble and ain't going to," and Hupp had just replied, "Let her stay and call the sheriff." Defendant also testified:

"Hupp and I had been friends before that. He had worked for me. He farmed some of my land the year before. We had a party at our house in March and Mr. and Mrs. Hupp were there with Mr. and Mrs. Kelley. We were friendly at that time. I never had had any trouble with Hupp until the 10th day of June, 1924."

There was evidence that twice on the morning of the tragedy before the killing the defendant announced his murderous intent; that when Hupp dismounted from the grader and first approached, the defendant stepped out from the gap and aimed the gun at Hupp and told him to stop or he would kill him. There was no provocation for this threat. Hupp neither offered to hit the defendant nor did he make any threats. His first words were, "What about this road?" They had been on friendly terms, but the defendant considered they were on hostile terms because Hupp was a member of this grading crew. The defendant was cursing the grading crew and made the threat that he "would kill the first man who moved the rocks." When this threat was made, Hupp had his back turned to Hardisty and was out in the road, east of the grader tongue, a distance of some fifteen feet from defendant. Hupp turned, threw up his hand but without making any threatening gesture, said, "You son-of-a-bitch, you wouldn't shoot a man in cold blood, would you?" The shot was then fired, not hastily but with deliberate aim.

WITNESS HERLAN: "Q. Just then Hardisty shot? A. No, sir; not right away; he took good aim; it seemed quite a while to me."

In conversation with Deputy Sheriff Allen, the defendant, after stating that he had shot Hupp, stated that he had shot to kill him, and that he did not shoot to miss him; that he wanted them to leave the rocks alone; that they were going to move them, and that he did not want them moved; that he had told them on yesterday that they could not tear them out, and he wanted to make his word

good. On their way to Lyndon they met Sheriff Lynch, to whom the defendant stated that he had killed Dude Hupp, and that if he had it to do over he would do it again; that no "God-damned son-of-a-bitch" could call his mother a bitch.

"Mere words, however abusive and insulting, will not justify an assault, nor constitute a sufficient provocation to reduce to manslaughter what would otherwise be murder." (*State v. Buffington,* 71 Kan. 804, syl. ¶ 6, 81 Pac. 465.)

The defendant made certain statements referring to his "word." These statements especially reflected the condition of his mind. His "word" meant that the rocks should not be moved.

(Witness Allen:) "He said he had told them on yesterday that they could not tear them out, and he wanted to make his word good."

Neither his act, nor these statements, were the result of a sudden, rash, unconsidered impulse or passion. They were rather the result of reflection and consideration.

"The law carefully distinguishes between a sudden transport of passion, which springs instantaneously from what it allows as a sufficient provocation, and which prompts to an immediate act of violence, and a purpose of revenge which usually follows such passion. In the first case, in condescension to the frailty of our nature, the law allows the provocation to extenuate a homicide committed at the instant from murder to manslaughter. In the other, the provocation furnishing an incentive to revenge, so far from extenuating the crime, is a circumstance to be looked to as evidence of malice; and especially would this be so if the prisoner, in consequence of the provocation, had made threats against the life of the deceased." (*State v. Yarborough,* 39 Kan. 581, 590, 18 Pac. 474.)

"While a premeditated, deliberate intent to take life is essential to the crime of murder in the first degree, yet if a party goes to have an interview with another, having armed himself with a deadly weapon with the intent to compel such other to do any certain thing, or upon his refusal, to kill him, such conditional intent to take life is sufficient to make the homicide, if committed, murder in the first degree." (*State v. Kearley,* 26 Kan. 77, syl.)

The evidence in the instant case justifies the conclusion that the defendant went to meet the graders with his loaded shotgun with a determination of preventing them from grading out the rock fills.

To recapitulate: The defendant made statements the first day that they were not going to take any more rock out, and that he would see them to-morrow. He repeated statements at the supper table and at breakfast the next morning that he would be there and that they would not take any more rock out. He went early in the morning to the place where the grader had been left the night before, to see how far away it was; told his wife before going to the field

on the fatal morning that he would be at the road when they came back; told Owen after their return from the field that he had told them he would be there when they got there, and that he had told them they were not going through, and they were not going through. His wife and Owen had advised him not to have any trouble over it. He was not excited then nor at any time before the killing. He equipped himself with a more formidable weapon than an injunction from a justice of the peace—a loaded shotgun—and being so equipped, went to the gap to wait for the graders, to make his word good. He picked up the gun before they arrived, although his wife cautioned him while the graders were still thirty or forty feet away, not to pick it up—that he did not need it.

"Q. When you shot at Mr. Hupp that morning, you shot to kill, didn't you? A. Yes, sir.

"Q. It was not an accident on your part? A. Not a bit of it.

"Q. Did you take aim just the same as if you were shooting anything else except a human being? A. I sure did."

So much time intervened between the altercation on the first day and the killing on the second, there was so much counsel against having trouble, so much deliberation and determination on his part that they "should not pass," so much thought, contrivance and design on his part in possessing himself of the shotgun with which he killed the deceased, it is perfectly apparent he had determined to use whatever force or means might be necessary to prevent the graders from taking out the fills. Under the instructions the jury might have found the defendant guilty of murder in the second degree or they might have adopted the defendant's theory of self-defense and found that his act was justifiable. Considering all these matters, the finding was that of murder in the first degree. Under the circumstances we conclude that the trial court committed no error prejudicial to the defendant in refusing to instruct the jury as to the several degrees of manslaughter. (See *State v. Yarborough,* supra.)

The court instructed the jury that the defendant was presumed to be innocent of the charge against him, and innocent of any degree of crime therein, and of every material fact which the state must prove in order to establish his guilt of any offense whatever, which presumption must continue until every ingredient of the offense charged or of any inferior degree thereof, was proved beyond a reasonable doubt; and where his guilt was so proved, but there was a reasonable doubt as to which of two or more degrees of an offense he was guilty,

he could be convicted of the highest degree only of which such reasonable doubt did not exist. Also, that "if any of the foregoing essentials, viz., malice, intent, willfulness, premeditation, deliberation, design, mode of killing or place of killing was not proved beyond a reasonable doubt," then they should not find the defendant guilty of murder in the first degree. Also that murder in the second degree must have been purposely and maliciously, but without premeditation or deliberation, and if the essential elements of second degree murder were not proved to the satisfaction of the jury beyond a reasonable doubt, the defendant should not be found guilty of second degree murder. Instructions were also given as to justifiable and excusable homicide. Also, that if they did not find from the evidence that defendant was guilty of murder in the first degree, they might proceed to inquire if he was guilty of murder in the second degree; and if they did not find him guilty of murder in the second degree beyond a reasonable doubt, they should return a verdict of not guilty.

Under these instructions the jury necessarily considered the question of the presence of malice. They were told that if that essential element of murder was lacking it was then their duty to acquit the defendant. Their verdict indicates a finding that premeditation and deliberation, as well as malice, were established by the evidence; for which conclusion there was abundant evidence. With these elements present the crime could not be manslaughter, and the defendant was not prejudiced by the refusal of the court to instruct as to manslaughter. If the verdict had been for second-degree murder there would be room to suppose the jurors might have found the defendant guilty of manslaughter only, if the opportunity to do so had been afforded them. But inasmuch as, having a choice between first- and second-degree murder, they elected the former, there is no reasonable probability that they would have returned a verdict of manslaughter if that issue had been submitted to them.

"We agree with counsel that the court should correctly charge the jury as to all the law applicable to every state of facts fairly supported by evidence, and that the rule declared in *State v. Dickson* ought not to be extended to unreasonable limits. But where the jury under proper instructions have found the defendant guilty of every element of the superior offense, erroneous instructions, or a total failure to instruct with reference to an offense inferior in degree and including less criminality cannot logically be said to have influenced the jury. The failure of the court can only be said to be prejudicial to the defendant on the theory that the jury failed to fully comprehend the definition of the superior degree, or misconstrued and misapplied the law to the facts.

To indulge in such presumptions, even though we know that mistakes are made by juries and courts alike, is to overturn the whole theory of the administration of justice." (*State v. McCarty,* 54 Kan. 52, 58, 36 Pac. 338. See, also, *State v. Dickson,* 6 Kan. 209; *State v. Potter,* 15 Kan. 303; *State v. Yarborough,* supra; *State v. Reed,* 53 Kan. 767, 37 Pac. 174; *State v. Winters,* 81 Kan. 414, 105 Pac. 516; 17 C. J. 352.)

A contention that the evidence did not support the verdict cannot be sustained. It requires no additional discussion.

Complaint of misconduct of counsel in argument to the jury has been considered. It was fully presented to and considered by the trial court on the hearing of a motion for new trial. It embodies no error.

Other alleged errors have been considered, but none appear which would warrant a reversal.

The judgment is affirmed.

DAWSON, J. (dissenting): The record shows that on the day of the tragedy, as well as on the preceding day, the plaintiff's property rights were flagrantly, illegally and repeatedly violated, and that he was being grievously affronted and his property rights violated at the time of the killing. That these highly provocative and extenuating circumstances were insufficiently considered in the trial court is perfectly obvious from the nature of the verdict returned by the jury, for there was no evidence tending to show that the killing of Henry Hupp by Frank Hardisty was premeditated; and certainly there was neither accusation nor evidence that Hardisty killed Hupp while Hardisty was engaged in the perpetration of some other felony.

Disregarding altogether the testimony of defendant and his wife which tended to prove excusable homicide, the evidence in the record fairly tended to prove defendant guilty of some degree of voluntary and culpable homicide of less gravity than murder in the first degree. To correctly determine just what degree of guilt attached to the defendant was exclusively the function of a jury under proper instructions, which the trial court erroneously declined to give. The record contains no substantial evidence to support a verdict of guilty of murder in the first degree as defined by the statute. (R. S. 21-401.) I therefore dissent.