No. 34,718

THE STATE OF KANSAS, *Appellee*, v. BURVLE GORDON, *Appellant*.

(101 P. 2d 888)

Opinion filed May 4, 1940.

*John A. Etling, W. N. Beezley,* both of Kinsley, *G. W. Finney* and *Maurice Wildgen,* both of Larned, for the appellant.

*Jay S. Parker,* attorney general, *A. B. Mitchell,* assistant attorney general, and *Russell L. Strobel,* county attorney, for the appellee.

The opinion of the court was delivered by

HOCH, J.: This appeal is from a conviction of second-degree manslaughter. Appellant was tried on a charge of manslaughter in the first degree. The court instructed also as to manslaughter in the second and the fourth degrees, advising the jury that it should successively consider the question of defendant's guilt under the lesser degrees if it found him not guilty of the greater.

The appellant makes two principal contentions; first, that there was no evidence to warrant instructions on manslaughter in the second degree or to support such a verdict; second, that under the definitions of the statute, manslaughter in the second degree is not a lesser offense falling within the offense of manslaughter in the first degree. Before stating the contentions more specifically let us note the provisions of the statutes.

Manslaughter in the first degree is defined in G. S. 1935, 21-407, as follows:

"The killing of a human being without a design to effect death, by the act, procurement or culpable negligence of another, while such other is engaged in the perpetration or attempt to perpetrate any crime or misdemeanor,

not amounting to a felony, in cases when such killing would be murder at the common law, shall be deemed manslaughter in the first degree."

Manslaughter in the second degree is defined in G. S. 1935, 21-412, as follows:

"Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or do any other unlawful act, after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree."

The first contention is that in order to establish guilt of manslaughter in the second degree, it is necessary to show that the killing took place *"after an attempt"* by the deceased to commit a felony or do any other unlawful act *"shall have failed,"* and that in the instant case there was no evidence that any such attempt had been made and *had failed.*

The point urged in the second contention is that the definition of manslaughter in the first degree definitely *excludes intent*—by using the words "without a design to effect death"—while the definition of manslaughter in the second degree *includes,* by implication, the element of *intent,* and that therefore the second offense cannot be a "lesser offense" within the first.

Preliminary to discussion of these contentions, a brief narration of the facts will suffice. The appellant will be referred to as the defendant and the man he was charged with killing as the deceased.

The defendant was an employee of a pool hall. On the morning in question he was cleaning up the place, being assisted by a helper. Soon after they started work the deceased entered the pool hall and asked for beer. The defendant refused to give him beer, telling him he was intoxicated and should go on home. Angered by the refusal, the deceased threatened the defendant, called him a vile name and approached him in a menacing manner. The defendant seized a stick, struck the deceased repeatedly, knocking him down at least once and possibly more than once. These blows were on the head, arms, hip, and perhaps other parts of the body. Soon after leaving the pool hall the deceased died, the cause of death being ascribed by the attending doctor to a hemorrhage caused by one or more of the blows.

We first review the record for the sole purpose of determining whether there was any substantial evidence bringing the acts of the defendant within the definition of manslaughter in the second degree. In other words, whether there was any substantial evidence indicat-

ing an unnecessary killing in resisting an attempt by the deceased to commit an unlawful act after failure of the attempt. Needless to say, it is not our function to weigh the evidence and determine the guilt or innocence of the defendant.

While the record is not entirely definite in all details and the precise order in which some of the events took place may not be free from doubt, the substance of the testimony is reasonably clear. The defendant testified that he told the deceased that he couldn't let him have any beer; that he was drunk and should leave the place and go on home; that at that time he (defendant) was out in front of the bar between two front tables; that he told the deceased that he would not give him any beer or anything to drink because he was too drunk; that the deceased did not start home but "came at" the defendant, calling him a vile name and telling him "you will give me beer;" that he was afraid he would suffer serious injury; that as he looked up and saw the deceased coming, he attempted to get away from him by going around behind the bar; that when he got to the end of the bar the deceased caught him and took hold of him with a heavy grip on his left wrist; that he jerked away and went on around the end of the bar; that the deceased came on behind the bar after him; that he grabbed what was said to be the butt end of a billiard cue and struck the deceased with the intention of stopping him; that he first struck him about the jaw; that the blow did not knock him down; that the deceased came on and he struck him again; that the deceased dropped down on his hands and tried to get a bottle from a case of bottles beneath the bar; that he hit him about the back and shoulders; that he did not know exactly how many times he struck the deceased; that the deceased straightened up and looked like he had something in his hand; that he started hitting him again; that the deceased dropped down on his hands and the helper came up and said, "For God's sake, Burvle (defendant's first name), let up;" that he didn't strike him after that, but told the helper to get the deceased out of there. The defendant did not testify that the deceased got hold of a bottle or that he held anything in his hand at any time. He said that it looked like he had something in his hand.

The helper's testimony was substantially the same as that of the defendant concerning what happened in the pool hall that morning prior to the time the blows were struck. He then testified that he did not pay much attention because he didn't think anything was going to happen; that the next thing he knew "they were into it up

there"; that when he turned around the defendant was back of the bar and had a stick or club in his hand and was "coming down with it"; that he couldn't tell just exactly where the blows were landing, but they must have been some place about the head and shoulders; that he didn't count the blows and couldn't tell how many there were, but his best estimate was seven or eight; that when he first observed them, the deceased was about halfway in behind the bar and was coming up from the floor; that his (deceased) hands were out in front of his face or head; that he saw the blows struck while the deceased was coming up; that the deceased reached around and got hold of the bar; that the defendant walked to the end of the bar and after that he saw one blow struck which he thought landed across the hip; that most of the blows he saw were struck as the deceased was rising from the floor; that when he saw these blows being struck he yelled for the defendant to "lay off" or something to that effect; that he didn't see the deceased strike any blows; that he didn't see anything in the hands of the deceased at any time. On cross-examination the helper testified that his best guess was that the defendant struck the deceased seven times, but he could only remember of seeing two blows; that the first blow he remembered was across the head. When asked whether the deceased went down as a result of the blows, he answered: "No, I can't even remember him being down." He further testified on cross-examination that he thought the other blow he saw was across the hip; that as the deceased came up the defendant struck him; that when he testified it was the first blow that floored the deceased he meant it was the first blow he saw him strike; that he didn't know for sure whether it was the first blow that floored him because he didn't know whether there were any blows struck before the first blow that he saw.

From this testimony the jury was undoubtedly justified in believing that the deceased had attempted to injure the defendant, thereby committing an unlawful act. Can it then be said that the jury could not also arrive at the conclusion, from the evidence, that this attempt to assault and seriously injure the defendant had failed and that thereafter the defendant continued to strike severe and unnecessary blows? We think not. There was testimony sufficient to support the verdict. Had the court, in the face of the evidence adduced, refused to instruct the jury that they should consider the question of second-degree manslaughter if they had reasonable doubt as to defendant's guilt of first-degree manslaughter, and the jury had found

the defendant guilty of first-degree manslaughter, there can be little doubt that the defendant would then be here—and properly so—assigning error in the refusal to instruct as to manslaughter in the second degree. An instruction concerning manslaughter in the second degree was not only justified, but upon the record before us, the court would have erred had it failed to give such an instruction. (*State v. Buffington*, 66 Kan. 706, 72 Pac. 213; *State v. Clark*, 69 Kan. 576, 77 Pac. 287; *State v. Newton*, 74 Kan. 561, 87 Pac. 757; *State v. Hardisty*, 121 Kan. 576, 580, 249 Pac. 617; *State v. Phelps*, ante, p. 199, 97 P. 2d 1105, and cases therein cited.)

The gist of appellant's second contention is that "intent to kill" is an implied element in the definition of manslaughter in the second degree, and that when a defendant is charged with manslaughter in the first degree, which applies only to "the killing of a human being *without a design to effect death*," he is thereby absolved from an *intent* to kill, and cannot be found guilty of manslaughter in the second degree. In the first place, this contention inaccurately assumes that the word "design" is fully synonymous with the word "intent." The word "design" may and usually does mean something more than the word "intent" as ordinarily understood in connection with criminal offenses. It carries with it an idea of a plan, a scheme, a deliberate purpose. (2 Words & Phrases, 2d Series, 16, 17.) The word "intent," on the other hand, does not necessarily carry with it the idea of a deliberate purpose or plan. While persons of sound mind are ordinarily presumed to *intend* the natural and probable consequences of their acts, it does not follow that *design* to effect the result is thereby presumed to exist.

In the second place, we find nothing in the definition of manslaughter in the second degree which limits it to *voluntary* homicide. The only necessary elements are that the killing be unnecessary under the facts and circumstances and that it take place while resisting an attempt to commit a felony or do another unlawful act, after the attempt has failed. It is unnecessary here to discuss the familiar distinction between voluntary and involuntary manslaughter. We find nothing in the statute itself which precludes a defendant who is charged with manslaughter in the first degree from being found guilty of manslaughter in the second degree.

No error in the record being shown, the judgment is affirmed.